Mary A. COLLINS, Plaintiff–Appellant,

v.

**BAPTIST MEMORIAL GERIATRIC CENTER, and Odus Taylor Henley, Defendants–Appellees.**

No. 90–1396.

United States Court of Appeals, Fifth Circuit.

Aug. 2, 1991.

Rehearing Denied Aug. 29, 1991.

Steven C. James, Beck & James, El Paso, Tex., for plaintiff-appellant.

Don W. Griffis, Griffis, Woodward, Colia & Motl, P.C., for defendants-appellees.

Before GOLDBERG, HIGGINBOTHAM, and JONES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Mary Collins appeals an adverse judgment on her Title VII sexual harassment claim. At trial, she developed three theories in support of the claim—retaliation, hostile environment, and quid pro quo. The essence of her claim is that the executive Director of the Baptist Memorial Geriatric Center sexually harassed female employees and fired her for opposing the harassment. Defendants deny harassment and urge that Collins was fired for insubordination. Most of the issues on appeal relate to the sufficiency of the evidence in support of the district court's judgment. A

jury rejected several parallel state claims. We affirm the judgment against Collins insofar as her claim rested on theories of retaliation and hostile environment, but remand for additional findings on the theory of quid pro quo. Collins did not appeal the judgment dismissing her state claims.

## I.

Baptist Memorial Geriatric Center hired Mary Collins as personnel director in February of 1986. She asserts that during her tenure as personnel director, she became concerned with the conduct of the Center's executive director, Odus Henley, eventually discussing Henley's relationship with his secretary and his conduct toward other female employees with a member of the Board of Trustees, Bill Denton. There was evidence that Denton asked for more facts before bringing the matter before the Board, and Collins began gathering statements from female employees at the Center in December of 1987. Although several of the statements are largely directed to Henley's relationship with his secretary, the statements also document tight hugs and other physical contacts with female employees generally. Susan Myers, secretary to executive vice president Wayne Merrill, independently mailed a number of anonymous letters to the Board concerning Henley at about the same time.

On March 21, 1988, shortly after Collins delivered the statements to Denton, Henley fired her. He had earlier issued two formal reprimands. On February 15, 1988, he reprimanded Collins for "[a]pproval or and request for unauthorized salary advances to employees over a period of time." And on March 11, 1988, he reprimanded her for "[a]ssuming authority which had been specifically forbidden and reserved to only the Executive Director who was on duty or the Executive Vice President." Henley issued a third formal reprimand when he fired Collins. At trial, Henley testified that he fired Collins for insubordination. She contends that his real motive was retaliation for her opposition to his conduct toward

female employees. The Board of Trustees gave Henley a vote of confidence.

Collins filed this suit against Henley and the Center, alleging both Title VII and state law violations, on January 17, 1989. The Title VII claim was tried to the district court, and the state claims to the jury. The jury found that Collins was not fired for reporting acts of harassment and discrimination or for refusing to ignore harassment and discrimination. The jury also found, however, that the Center had failed to exercise ordinary care in investigating and stopping harassment and discrimination. Reconciling the findings, as we must, the jury presumably believed that there was misconduct but that Collins was not fired for opposing it. The jury awarded no damages on the breach of care claim, finding that the Center's negligence was not a proximate cause of damage to Collins, and found for the defendants on the remaining state claims.

The district court similarly found for the defendants on the Title VII claim. Some of the district court's factual findings are sketchy if read alone. The court also adopted the jury's findings and cited them in support of its own conclusions. The district court entered judgment for the defendants. Collins appeals the adverse judgment on the Title VII claim to this court but not the judgment on the state claims entered on the jury's verdict.

## II.

The parties make much of the shifting burdens of proof outlined by the Supreme Court in *Texas Department of Community Affairs v. Burdine*,[1] and *McDonnell Douglas Corp. v. Green*.[2] The case has been fully tried on the merits. "On appellate review of a fully tried case, we do not concern ourselves with the shifting burdens of proof that are relevant at trial. Rather, we limit our review to the district court's findings on the ultimate question of

---

**1.** 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**2.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

discrimination vel non."[3] Collins bore the ultimate burden of persuasion on her Title VII claim, a burden that the district court believed she had not met.[4]

## III.

At trial, Collins developed three theories in support of her Title VII claim—retaliation, hostile environment, and quid pro quo. We address each in turn.

### A. *The retaliation claim.*

■ A plaintiff must show three things to establish a prima facie case of retaliation—that she engaged in an activity protected by Title VII, that an adverse employment action followed, and that there was some causal connection between the activity and the adverse action.[5] Collins' opposition to perceived harassment was a protected activity even in the absence of a hostile environment or quid pro quo actionable under Title VII.[6] At trial, then, whether there was a causal connection between Collins' opposition to Henley and her termination was a major issue. Collins need not have established that her protected activity was the sole factor motivating the termination, but the burden was on her to show that " 'but for' the protected activity she would not have been subjected to the action which she claims."[7]

■ Henley and the Center asserted at trial that Collins was fired for insubordination.[8] When pressed, Henley could identify only two specific examples of insubordination, approving cash advances and releasing early paychecks. Henley admitted that he had initially authorized Collins both to approve cash advances and to release early paychecks. He could not point to the date on which he rescinded either authorization, document the fact that he rescinded the authorization, or identify any employees receiving unauthorized advances or early paychecks. Henley attributed his inability to document the unauthorized advances and early paychecks to poor record-keeping.

Collins testified that she generally sent all employees requesting cash advances to Henley or Merrill for approval, but that Henley had told her that she need not do so with small advances. She believed that her first reprimand resulted from a misunderstanding. Henley conceded that all of the cash advances produced from the relevant time period were signed either by himself or by Merrill. Collins also testified that Henley had authorized her to release early paychecks in emergency situations and that he did not revoke the authorization until the second reprimand.[9]

3. *Johnson v. Harris County Flood Control District,* 869 F.2d 1565, 1571 (5th Cir.1989); *see also Ansonia Board of Education v. Philbrook,* 479 U.S. 60, 67, 107 S.Ct. 367, 371, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *U.S. Postal Service Bd. of Governors v. Aiken,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Comeaux v. Uniroyal Chemical Corp.,* 849 F.2d 191, 193 (5th Cir. 1988).

4. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

5. *Jones v. Flagship International,* 793 F.2d 714, 724 (5th Cir.1987).

6. *Id.* at 727–28.

7. *Jack v. Texaco Research Center,* 743 F.2d 1129, 1131 (5th Cir.1984).

8. Several of the witnesses aligned with the defense also mentioned a "personality conflict" between Henley and Collins. Collins conceded that there were tensions between herself and Henley, but claimed that the tensions developed at about the time that she began gathering the statements from female employees. To the extent that a "personality conflict" arose because of Collins' protected activities, rather than independently, the conflict would not provide a legitimate reason for Collins' termination.

9. Most of the other witnesses at trial, even those aligned with the defense, testified that they had not witnessed any instances of insubordination and that Collins was a good worker. Merrill and former executive vice president Vic Rhoades stated that Collins retained a professional demeanor, suffered no deterioration in her work, and never became insubordinate to them. Kay Wright, assistant personnel director to Collins and personnel director at the time of trial, testified that Collins was personable, likeable, and professional; she had never witnessed any acts of insubordination. Sanders and Henley's secretary, Mary Butts, also testified that they had not witnessed any acts of insubordination. Like Henley, neither Merrill nor Wright could identify any unauthorized cash advances or early paychecks.

Collins also countered with circumstantial evidence that the defendants' allegations of insubordination were a pretext for retaliation. She testified that she delivered the statements to Denton on the morning that she was terminated. While she was in Denton's office, Denton called the Chairman of the Board, Frank Sanders, and told him that he had the statements and would bring them to Sanders that day. She then returned to the Center and, shortly thereafter, received a phone call from Myers. Myers told her that "Mr. Merrill had come across the hall from Mr. Henley's office and told her that Mr. Henley was extremely angry that he was outraged; that he had never seen him as mad as he was; that Frank Sanders had called Mr. Henley and told him about the reports being turned over to Bill Denton, and that he had told him to plug the leak in personnel." Myers corroborated this statement in her testimony, adding that "[t]here was more than one conversation about leaks in the personnel department." Henley terminated Collins later the same morning.

Henley was unable to identify the "final thing" that prompted him to terminate Collins. He admitted meeting with Merrill that morning, for unrelated reasons, but denied speaking to Sanders. Merrill could not remember if he had spoken to Sanders that morning. He testified that Sanders had mentioned a "leak" to him on another occasion; Sanders was then referring to "an anonymous letter that spelled out some salaries, and they were to the penny." [10] Sanders denied entirely having spoken with either Henley or Merrill that morning about a "leak" in personnel. He testified that he had received the statements from Denton either that morning or the night before. Although Denton could not remember when he delivered the statements at the time of his deposition, he testified at trial that he had delivered them to Sanders'

home at about 5:00 p.m. on the day Collins was fired.

Henley denied knowing that Collins had been gathering statements when he fired her. Denton testified that he never told Henley, Merrill, or Sanders that Collins was the source of the statements. On the other hand, he did discuss the situation without naming Collins with Henley, Merrill, Henley's pastor, a number of the Center's employees, and several Board members. Collins was convinced that Henley connected her to the statements because his attitude toward her changed in December of 1987, about the time that she began gathering the statements.

In sum, the evidence produced at trial was complex, confusing, and even contradictory. The resolution of the retaliatory motive issue turned largely on credibility choices. If, as he claimed, Henley had no knowledge that Collins was gathering the statements, then it would be difficult to attribute a retaliatory motive to him. And the strength of the circumstantial evidence of pretext turned largely on the "leak" conversation, a conversation denied by both Henley and Sanders. In fact, the only evidence of the "leak" conversation came from Myers and Collins.

The district court concluded simply that "Mrs. Collins was terminated by Mr. Henley for insubordination." In the absence of the parallel state claims, we might have remanded to the district court for further findings pursuant to Fed.R.Civ.P. 52(a). Rule 52(a) " 'exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness,' but it does require findings that are explicit and detailed enough to enable us to review them under the applicable standard." [11]

In this case, however, the jury's findings on the parallel state claims lend substantial support to the district court's findings. As stated by the Seventh Circuit in *McKnight*

10. The "leak" references could conceivably relate to disclosures of confidential information rather than sexual harassment charges. But the defendants did not articulate breaches of confidentiality as a reason for terminating Collins. Collins denied leaking any confidential salary information.

11. *Lopez v. Current Director of Texas Economic Development Com'n,* 807 F.2d 430, 434 (5th Cir. 1987) (quoting *Ratliff v. Governor's Highway Safety Program,* 791 F.2d 394, 400 (5th Cir. 1986)).

*v. General Motors Corp.,*[12] "[if] it is clear from the record and the jury's verdict what the jury must have found and therefore what the district judge, in registering agreement with the verdict, must also have found, a remand for explicit findings is not required, because it would add nothing to the information that the appellate court already has." We are persuaded that the findings are not clearly erroneous and the attendant credibility choices were within the province of the jury.

## B. *The hostile environment claim.*

■ A plaintiff must show five things to establish a prima facie case of sexual harassment under a hostile environment theory—that she belongs to a protected group, that she was subject to unwelcome sexual harassment, that the harassment was based on sex, that the harassment affected a term or condition or privilege of employment, and if appropriate, some ground to hold the employer liable.[13] At trial the weakest link in Collins' hostile environment claim became the issue of whether any physical contacts of Henley with other female employees altered a term of Collins' employment.

■ Collins conceded that Henley only hugged her and then only during a short period when she first began working at the Center. She urged that Henley's contacts with other female employees affected the psychological terms of her employment. Psychological well-being is a term, condition, or privilege of employment within the meaning of Title VII, but a claim based on psychological harm "requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment."[14] And harassing incidents not involving Col-

lins herself will not sustain her claim, unless there is evidence that the incidents involving other female employees "affected [her own] psychological well-being."[15]

■ At trial, Collins presented a number of witnesses who testified to Henley's physical contacts with female employees. Although Henley and his secretary denied any special relationship, several witnesses observed them in questionable circumstances. Most of the witnesses observed Henley tightly hugging female employees or rubbing their backs. Of the plaintiff's witnesses who were themselves hugged by Henley, Kay Wright welcomed the hugs as non-sexual expressions of friendship, but the rest felt uncomfortable when touched by Henley. Perhaps most telling, Henley's hugs were often a subject of conversation, and an object of complaint, among the employees at the Center. Henley and the Center countered with three witnesses who did not find Henley's hugs offensive.

The district court concluded that "uncontroverted testimony" showed that Henley was a "demonstrable person" and that there was no evidence that he was an abuser or molester of women, no evidence that he sought sexual favors from Collins or others, and no evidence that he was lewd or suggestive to Collins. Collins did not contend otherwise. The basis of her claim was the evidence of Henley's hugs and physical contacts with other female employees.

The district court's finding is a mixed conclusion of law and fact, subject to the independent review of this court.[16] The district court's failure to confront the factual issues directly is troublesome. The jury was persuaded that sexual harassment did occur thus crediting Collins' witnesses. The Supreme Court has cautioned, how-

---

**12.** 908 F.2d 104, 113 (7th Cir.1990).

**13.** *See Jones,* 793 F.2d at 721–22; *compare Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986) (declining to issue a definitive rule on employer liability).

**14.** *Jones,* 793 F.2d at 720; *see also Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1981).

**15.** *Jones,* 793 F.2d at 721 n. 7.

**16.** *See Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982) (noting that the standard of review of mixed questions is an open issue); *Jordan v. Clark,* 847 F.2d 1368, 1375 n. 5 (9th Cir.1988) (stating that the district court's final conclusion, that the defendant's harassment did not alter a term of employment, was a mixed question subject to independent review).

ever, that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." [17] This was the weak link in Collins' hostile environment theory. Her evidence that conduct toward other female employees was sufficiently severe or pervasive to alter the psychological terms of her own working environment was far from compelling. Significantly, the jury was not persuaded that the Center's failure to exercise ordinary care in investigating and stopping instances of discrimination and harassment was a proximate cause of injury to Collins. The district court adopted these findings. This was not error.

## C. *The quid pro quo/disparate treatment claim.*

A prima facie case under the quid pro quo theory is essentially the same as under the hostile environment theory, except that the fourth element involves job benefits conditioned on the acceptance of the harassment. "The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment." [18]

Collins attempted to prove at trial that female employees receptive to Henley received higher wages and more favorable treatment. Collins herself received one $0.20 raise and three $0.15 raises during her two years at the Center. This theory gained support from the testimony of former executive vice president Vic Rhoades. He testified that several female employees, not specifically identified, approached him while he was at the Center and expressed concern that their response to Henley's hugs and other physical contacts might affect their job. He suggested that Henley's secretary was "put into a position before [he] left that she was not qualified for" because of her relationship with Henley.

He also testified that, in his opinion, several of the female employees receptive to Henley "got favorable treatment," a situation that he discussed with two members of the Board. On cross-examination, however, he stated that he was not aware of any instance where an employee was terminated or adversely affected in salary because she indicated to Henley that she did not want him to hug her.

Several of the other witnesses testified that they noticed no changes in her duties after Henley's secretary was promoted from secretary to retirement administrator; they believed that the promotion was an example of special treatment. Not all could describe Butts' duties as retirement administrator, however. Myers and Collins also believed that the employees receptive to Henley received higher raises and extra vacation time. In an attempt to substantiate the quid pro quo, Collins' attorney led Collins' successor, Kay Wright, through an extensive comparison of the raises of various employees. On cross-examination, the defendants' attorney led her through a comparison of yearly salaries, pointing out that Collins' yearly salary was larger than those of most of the employees receptive to Henley.

The district court did not explicitly explain its evaluation of the evidence. Instead, it stated that Butts' salary was raised from $8.65 an hour to $10.82 an hour upon her promotion to retirement administrator and later to $12.02 an hour to bring her salary in line with other administrative heads. Additionally, the district court added that Butts' and Collins' positions involved different departmental levels and different responsibilities, implying that comparisons were inappropriate. Neither finding addresses Collins' suggestion that she would have received higher raises had she been more receptive to Henley. Certainly the testimony of Wright comparing raises, as opposed to yearly salaries, was at

---

**17.** *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. at 2405.

**18.** *Jones,* 793 F.2d at 722 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982)).

least relevant to the issue.[19]

The quid pro quo element of Collins' claim is subject to the independent review of this court. Unlike the retaliation claim, none of the state law claims parallel the quid pro quo claim. We therefore must remand the quid pro quo claim to the district court for further findings.[20] We imply no opinion on the merit of this factual controversy. That is for the district court. While it is understandable that this claim was not separately focused upon given the number of theories of recovery urged upon the bench and jury, we need further assistance.

### IV.

We find no merit in Collins' remaining challenges to the factual findings of the district court. The district court found that "Mrs. Collins considers the fact that Mrs. Butts was paid more than she was paid to be an indication of salary discrimination at the Center." Collins points out that she also testified that other women receptive to Henley received preferences, but of course this does not make the finding clearly erroneous.

The district court described the letters received by the Board of Trustees as "anonymous." Collins contends that "the mistaken implication there is that anonymous means worthless," but we do not find such an implication in the finding.

The district court stated that no one was present at the April 12 Board meeting to substantiate the accusations against Henley. Collins points out that Sanders, Denton, Merrill, Dorchester, and Allred were there, but this does not make the finding clearly erroneous because they had only second-hand knowledge of Henley's conduct toward female employees.

Finally, Collins challenges the district court's failure to order its findings under *Burdine* and *Jones*. The cases cited by Collins involved insufficient factual findings.[21] Any weakness in legal analysis by the district court in this case, by contrast, does not make appellate review impossible. Significantly, as we have observed, the shifting burdens outlined in *Burdine* were not relevant after the full trial on the merits.

### V.

In sum, we affirm the denial of Collins' Title VII claim insofar as it relies upon theories of retaliation and hostile environment but remand upon the quid pro quo theory for further findings. The district court is not required to take additional evidence. The judgment of the district court is AFFIRMED in part and, in part, VACATED and REMANDED.

---

**19.** The comparison of raises, when considered as a percentage of yearly income, was probably a better indicator of favoritism than the comparison of yearly income. This court expresses no view on the comparison of raises at this time. Certainly the comparison of raises must be considered alongside other factors such as work performance.

**20.** *See Lopez,* 807 F.2d at 434; *see also Smith v. Texas Dept. of Water Resources,* 799 F.2d 1026, 1031 (5th Cir.1986); *Sylvester v. Callon Energy Services, Inc.,* 724 F.2d 1210, 1216 (5th Cir. 1984).

**21.** *See Rucker v. Higher Educational Aids Bd.,* 669 F.2d 1179, 1183–84 (5th Cir.1982); *Jefferies v. Harris Cty. Community Action Ass'n,* 615 F.2d 1025, 1031 (5th Cir.1980).