United States Court of Appeals,

Fifth Circuit.

No. 92-3723.

Lee H. SCHLESINGER, Plaintiff-Cross Claim Defendant, Appellant,

v.

Mitchell W. HERZOG, et al., Defendants-Appellees,

and

Sidney Lassen, et al., Defendants-Cross Claim Plaintiffs, Appellees.

Lee H. SCHLESINGER, Plaintiff-Appellant,

v.

CORPORATE REALTY INC., et al., Defendants-Appellees.

Lisa S. HERMAN, Plaintiff-Appellant,

v.

CORPORATE REALTY INC., et al., Defendants-Appellees.

Lisa S. HERMAN and Lee H. Schlesinger, Plaintiffs-Appellants,

v.

CORPORATE REALTY INC., Defendant-Appellee.

Sept. 21, 1993.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before WIENER, EMILIO M. GARZA, Circuit Judges and LITTLE,[*] District Judge.

LITTLE, District Judge:

Lee Schlesinger and Lisa Herman brought suit against Mitchell Herzog, Sidney Lassen, and various corporations controlled by Sidney Lassen, seeking damages pursuant to section 12(2) of the Securities Exchange Act of 1933 and section 10(b) of the Securities Exchange Act of 1934, as well as Rule 10b-5. Herman brought an alternative state claim under the Louisiana theory of unjust enrichment. The district court denied all of the plaintiffs' claims, including two motions for sanctions.

[*]District Judge of the Western District of Louisiana, sitting by designation.

For the reasons that follow, we affirm.

## I. *Background*

Lee H. Schlesinger and his sister Lisa Herman were wealthy. As third-generation members of the Latter real estate family of New Orleans, they owned partial shares in several central business district buildings and in Westminster Management Company. Westminster managed the family's downtown office properties, including three large Poydras Street buildings across from the Superdome. By 1986, Schlesinger had purchased all other family members' shares in Westminster except Herman's. He owned eighty-two percent and was the only shareholder active in the management of the corporation. Herman owned the remaining stock. The family gave Westminster complete control in managing its properties. Westminster also managed the personal business, including the establishment of credit lines, for several members of the family. Income generated by rental properties, together with borrowings, provided the wherewithal for many of the family members to live in the style to which they had become accustomed.

In 1989, however, the family's lifestyle collided with the collapse of the New Orleans real estate market to create a cash flow crisis. By the end of 1989, credit lines had been exhausted and the family had insufficient resources to pay ad valorem taxes due. Schlesinger and Herman had drawn on the family's credit lines in amounts disproportionate to their interest in the properties. Things were particularly bad for Schlesinger. In December 1989, Westminster reported an annual loss for the fourth time in five years, and the company's books showed a negative net worth of nearly $1.2 million.

Westminster's cash-flow crisis prompted the Latter family to search for an investor to supply a cash infusion for restructuring of shareholders' debts and redevelopment of certain properties. On 29 March 1990, the family held a meeting to discuss a proposal by one of Sidney Lassen's companies, Sizeler Property Investors, Inc. ("SPI"). At the meeting, the family authorized Schlesinger to prepare terms for an "asset deal" with SPI. The family engaged Young, Scanlon & Sessums, a Jackson, Mississippi law firm, to prepare a private placement memorandum setting out the terms of the intended transaction. By 9 April 1990, the Schlesinger and Lassen tentative agreement had been

unanimously approved by the family. In return for a cash infusion loan of $16 million, SPI would receive repayment at Chase Manhattan Corporation's prime rate plus one percent, as well as fifty-two percent ownership in the family's Common Street properties.

Things got worse for Schlesinger, however. On 17 April 1990, an unpaid mortgagee, The Equitable Life Assurance Society of the United States, threatened foreclosure on the Poydras Street properties. Not only was this bad news for the members of the family who owned an interest in these properties, but also Schlesinger felt an added pinch in that losing these properties meant losing approximately one-third of Westminster's management fees. At the suggestion of Mitchell Herzog, Schlesinger's lawyer and vice chairmen of SPI, Schlesinger went to Lassen for help. Lassen suggested that Westminster merge into a Lassen-created corporation. On the same day, at Schlesinger's request, Herman agreed to the redemption of all her Westminster stock. In the redemption agreement, Herman acknowledged that she had received value for the shares. Two days later, Westminster was merged by stock transfer into a new company named Westminster Asset Management Company ("WAM"), owned one percent by Schlesinger and ninety-nine percent by Sizeler Realty Company (a management company owned by Lassen).[1] In addition to a position in the management of the new corporation, Schlesinger was to receive twenty percent of net fees earned the first year or $400,000, whichever was greater.

By 1 May 1990, the foreclosure crises was over, and on 15 June 1990, a private place memorandum was issued containing the final terms of the family's "asset deal." In the meantime, however, auditors from the accounting firm of Ernst & Young had discovered that Westminster had greater debt than previously revealed. To close the asset deal, the family would have to provide an additional $3.6 million, an apparently unattainable amount. On Sunday, 9 September 1990, Schlesinger went to Lassen's home, called off the asset deal, and insisted that Lassen unwind the merger. Lassen refused.

The next day, 10 September, Schlesinger testified in a federal age discrimination case filed

---

[1]The survivor corporation was later renamed Westminster/Sizeler Asset Management Company and ultimately renamed Corporate Realty, Inc.

against Westminster. He asserted that the company had fired the plaintiff, an elderly security guard, not because of age, but because Westminster had been in such dire financial straits that it could not afford to pay the guard's salary. Referring to Lassen as a "white knight," Schlesinger testified that the merger into Lassen's created corporation had allowed Westminster to survive and had been in the best interest of all concerned.

On 12 September 1990, Schlesinger renewed his request to unwind the April transaction. Lassen responded with a letter refusing to unwind the merger, terminating Schlesinger's employment with WAM, but confirming that WAM would continue to comply with its agreement to pay Schlesinger 207 of net fees for one year or $400,000, whichever was greater.

On 9 October 1990, Schlesinger filed suit to rescind the merger, claiming that Westminster was a valuable and prestigious company stolen from him by fraud. He denied that "family problems" played any part in his agreeing to the merger. Rather, the merger was to have occurred simultaneously with the asset deal and was pushed through ahead of the asset deal solely because of Equitable's unexpected foreclosure threat. According to Schlesinger, the only reason he agreed to the merger was to give Lassen (who knew Equitable's president) "standing" to negotiate a workout with Equitable—both Lassen and Herzog had assured him that this "merger for convenience only" would be reversed if the asset transaction was not perfected.

After various counterclaims, removals, motions to intervene, and consolidations not at issue here, Schlesinger and Herman litigated claims before the federal district court for damages under section 12(2) of the Securities Exchange Act of 1933, section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5, as well as Herman's unjust enrichment claim. Pursuant to Rule 12(b)(6), the district court dismissed the plaintiffs' section 12(2) claims for failing to allege that they were "purchasers" with standing to bring the claim. After a bench trial, the court denied the 10b-5 claim, finding that the plaintiffs had failed to prove the requisite elements of misrepresentation, scienter, reliance, and due diligence. The court found that no promise to unwind the merger was ever made. Rather, faced with financial disaster and the threat of foreclosure, Schlesinger had agreed to the best deal he could negotiate under the circumstances—a deal he later regretted. The court also denied

Herman's unjust enrichment claim, finding that the redemption of Herman's stock had enriched Schlesinger, not the defendants.

## II. *The 10b-5 Claim*

Because the alleged promise to unwind the merger was not documented, resolution of this case rested on the credibility of testimony. In an effort to remove this appeal from the credibility realm, the appellants manage to contort their dissatisfaction into at least seven alleged failures of the district court to make specific findings of subsidiary facts in violation of Rule 52(a), eleven clearly erroneous findings of fact, and six errors of law.

A. *Rule 52(a)*

The appellants first attack the district court's decision on grounds that the court failed to make specific findings of fact and state separately its conclusions of law as required by Rule 52(a). Federal Rules of Civil Procedure. In essence, the appellants list their own version of the facts and then complain that the district court violated Rule 52 by ignoring these "facts."[2] The district court did not ignore facts. It simply found facts contrary to the appellants' liking.

In a separate section of its opinion labeled "The Law of 10B-5," the district court set out each element of a 10b-5 claim as defined by this court in *Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). To establish a Rule 10b-5 violation in this circuit, the plaintiff must prove: (1) a material misrepresentation in connection with the purchase or sale of a security (2) committed with scienter by the defendants and (3) relied upon by the plaintiff, (4) who has exercised due diligence to pursue his own interest so that his reliance is justifiable. *See Stephenson v. Paine Webber Jackson & Curtis, Inc.,* 839 F.2d 1095, 1098 (5th Cir.1988); *Dupuy,* 551 F.2d at 1014. The court's many-paged opinion detailed its findings of no misrepresentation, no scienter, no reliance, and no due diligence.

The district court did not recite every piece of evidence supporting its findings. Nor did it sort through the testimony of each of two dozen witnesses. But Rule 52(a) " " "exacts neither punctilious

---

[2]For example, the appellants argue that the district court ignored the "fact" that the merger was to unwind if the asset deal failed. The district court, however, specifically found that no such agreement was made. This finding was the linchpin of the court's decision.

detail nor slavish tracing of the claims issue by issue and witness by witness." ' "  *Collins v. Baptist Memorial Geriatric Cent.,* 937 F.2d 190, 194 (5th Cir.1991) (quoting *Lopez v. Current Director of Texas Economic Dev. Comm'n,* 807 F.2d 430, 434 (5th Cir.1987) (quoting *Ratliff v. Governor's Hwy. Safety Program,* 791 F.2d 394, 400 (5th Cir.1986))), *cert. denied,* --- U.S. ----, 112 S.Ct. 968, 117 L.Ed.2d 133 (1992).  It simply "require[s] findings that are explicit and detailed enough to enable us to review them under the applicable standard."  *Collins,* 937 F.2d at 194 (quoting *Lopez,* 807 F.2d at 434).  The district court's opinion easily passes this test.

B. *"Clearly Erroneous" Findings of Fact*

It is not difficult to see why the appellants contorted the court's factual findings into Rule 52 violations and errors of law.  When, as here, "the district court is faced with testimony that may lead to more than one conclusion, its factual determinations will stand so long as they are plausible—even if we would have weighed the evidence otherwise."  *Nielsen v. United States,* 976 F.2d 951, 956 (5th Cir.1992) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).  Because this case turned almost exclusively "on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings."  *Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512.  Where the court's finding is based on its decision to credit the testimony of one witness over that of another, "that finding, if not internally inconsistent, can virtually never be clear error."  *Id.*  Under this standard, none of the district court's findings is clearly erroneous.

The appellants challenge eleven of the court's findings.  We need consider only one.  Because we find no clear error in the district court's finding that the defendants made no misrepresentation, we need not address the remaining factual challenges, for without misrepresentation, there can be no 10b-5 liability.

The alleged misrepresentation was that the defendants promised to undo the merger if the asset transaction failed.  This alleged link between the two transactions is not subject to any writing whatsoever.  The memorandum containing the asset deal's final terms does not mention the merger and the merger documents do not mention the asset deal.  Thus, the court's decision rested almost

entirely on credibility determinations. The appellants claimed that during the two days prior to the merger, Herzog made oral statements to Schlesinger that the merger would be unwound if the asset deal fell through. Herzog denied this. Lassen denied that any such agreement had been made between Lassen and Schlesinger. At trial, testimony was introduced that Herzog had told others that the merger would be reversed if the asset transaction was not completed. Herzog does not deny that he suggested that as a possibility but was steadfast in his testimony that such an agreement between the principals was never prerequisite to the merger. To make the credibility call, the court looked to the circumstantial evidence surrounding the merger and to Schlesinger's testimony in the age discrimination case one day after asking to unwind the merger. The evidence did not support Schlesinger's allegation that a promise to unwind was made prior to the merger. Rather, the court found that a financially desperate Schlesinger had agreed to a merger he later regretted. We find no clear error.

C. *Errors of Law*

The appellants' asserted "errors of law" are not attacks on the court's conclusions of law, but rather syntactic variations of their factual challenges. As we explained in our Rule 52(a) discussion, the district court's opinion sets out in detail the necessary elements of a 10b-5 claim in this circuit and reflects a clear understanding of and strict adherence to these elements. Nevertheless, the appellants extract six errors of law.

First, the appellants argue that the court committed an error of law in finding it "significant" that none of the several merger and pre-merger documents mentioned the alleged promise to unwind. Apparently, it is the appellants' contention that the court viewed written documentation of the alleged misrepresentation as a prerequisite to establishing a 10b-5 violation. A reading of the court's statement in context, however, reveals that it was directed toward credibility. The court expressly stated in its opinion that it did not consider lack of documentation an issue. At most, the court viewed the lack of writing as one of the many factors undermining the credibility of Schlesinger's testimony. If the court had viewed lack of documentation as an impediment to 10b-5 liability, it is doubtful that it would have spent six days listening to twenty-four witnesses testify as to whether the

alleged oral promise was made. We find no error.

The appellants' second asserted error of law is that the court placed excessive significance on Schlesinger's "white knight" testimony. This is really an attack on the district court's finding that no misrepresentation was made. In making this determination, the court was particularly swayed by testimony given by Schlesinger one day after he had asked Lassen to unwind the merger. In the age discrimination suit, Schlesinger attempted to show that an elderly security guard had been discharged not because of age, but because Westminster was in such dire financial straits that it could not pay the guard's salary. To this end, Schlesinger testified that he was concerned about the company's financial future, that the merger had allowed the company to stay in business, that the merger was in the best interest of all concerned, and that Lassen had been a "white knight." One month later, Schlesinger filed this suit claiming that he had no economic motive for the merger—it had been for convenience only. The court found Schlesinger seriously impeached by the earlier testimony. The appellants point to no authority that would render this credibility call clearly erroneous, much less an error of law.

The third assignment of legal error is the district court's finding that the $400,000 "salary" was consideration for Schlesinger's surrender of Westminster stock in order to accomplish the merger. This argument is another factual challenge incognito and it too is without merit. The court did not find the $400,000 paid to Schlesinger to be salary. It constituted consideration for Schlesinger's stock and management position with the company in the merger. In addition to one percent ownership (which Schlesinger claims he refused to accept), it was agreed that Schlesinger would receive $400,000 or twenty percent of net fees, whichever was greater, to be paid in biweekly payments from April 1990 to April 1991. The obligation to make these payments apparently existed independent of any services performed by Schlesinger, for even after Schlesinger's employment with the survivor corporation was terminated in September 1990, the company continued with the payments through April 1991, until the $400,000 was paid in full. The appellants contend that the finding constitutes an error of law in addition to being clearly erroneous because the court failed to determine the value of Westminster and thus, could not have determined that the $400,000 was

adequate compensation. We disagree. The court did not determine that the price paid to Schlesinger was an adequate one, and because the court never reached damages, nothing required it to do so. The court's finding that the $400,000 was consideration for the transfer of Schlesinger's stock in the merger was merely one of several factors militating against the credibility of Schlesinger's claim that the merger did not stand alone but was to dissolve if the asset deal did not close. If Schlesinger's story that he received nothing in the merger had been true, it might have bolstered this otherwise tenuous claim. The court found, however, that while the merger "may not have been the smartest deal Schlesinger ever made," the consideration received was significant. This, along with other circumstantial evidence, undermined the existence of the alleged agreement to unwind. We find neither clear error nor error of law.

But the appellants wrench yet another error of law allegation from the district court's opinion. Pointing to a comment by the court that the plaintiff had created a "speculative grand conspiracy," the appellants complain that the court held them to a conspiracy burden of proof. This imaginative argument must fall with the others, for the court's comment appears to be just that, a comment upon the plaintiffs' gothic tale of third-generation family fortunes plundered by corporate huns masquerading as white knights. The plaintiffs' burden of proof is set out in the paragraph preceding the gratis dictum: "In order to prevail, Plaintiffs must show that the Defendants engaged in fraudulent practices or made material omissions or misrepresentations in connection with the sale of securities, upon which Plaintiffs relied, and which ultimately resulted in damages to Plaintiffs." This is precisely correct. *See Dupuy,* 551 F.2d at 1014.

The appellants concoct their fifth error of law from a statement by the court that it is not the court's function "to throw "liferings' to plaintiffs who are the victims of their own poor business judgment." The appellants argue that this statement constitutes an error of law because it reflects a misunderstanding of securities fraud. We disagree. First, even if this "liferings" adage were incorrect, it would not constitute reversible error, for the district court explained and applied the proper standard under 10b-5. Second, the statement also happens to be correct. To recover under 10b-5, a plaintiff must have relied on a fraudulent misrepresentation and must have exercised due diligence

in pursuing his own interest. *See Dupuy,* 551 F.2d at 1014. The appellants did neither.

Because the appellants' sixth error of law goes to the 10b-5 element of due diligence, or justifiability, we need not consider it, having found no clear error in the district court's finding of an absence of misrepresentation.

### III. *The 12(2) Claim*

The appellants argue that the district court erred in dismissing the plaintiffs' section 12(2) claims pursuant to Rule 12(b)(6). We do not reach the merits of this challenge. Although a section 12(2) plaintiff need not establish the 10b-5 elements of scienter and reliance, he must prove that the defendant made a misrepresentation or omission of material fact in connection with the securities transaction. Because the appellants have failed to establish the existence of such a misrepresentation, no 12(2) claim can lie.

### IV. *Unjust Enrichment*

Herman's jeremiad charges that the trial court failed to evaluate adequately her alternative state claim of unjust enrichment. To recover under the Louisiana theory of unjust enrichment, a plaintiff must establish five factors: (1) the defendant was enriched; (2) the plaintiff was impoverished; (3) the enrichment and impoverishment were causally connected; (4) no justification existed for the enrichment and impoverishment; and (5) the plaintiff has no remedy at law. *Minyard v. Curtis Prod., Inc.,* 205 So.2d 422, 432 (La.1967). The district court found that Herman's transfer of her stock enriched Schlesinger, not the defendants. In other words, the court found no causal connection between Herman's impoverishment, if any, and any enrichment on the part of the defendants.

Herman owned no stock at the time of the merger. Prior to the merger, at Schlesinger's request, Herman's stock was redeemed by Westminster. If Westminster had owed Herman for the redemption at the time of the merger, the survivor corporation would have assumed this obligation (as it did other outstanding obligations on Westminster's books) and Herman would have had a claim in contract. But Herman could not assert such a claim because on the date Westminster redeemed her stock, she signed a document acknowledging receipt of consideration.

The district court rejected Herman's unjust enrichment claim, finding that Herman transferred her stock to benefit Schlesinger and that any additional compensation owed her was owed by Schlesinger. Although any claim Herman might have had against Schlesinger was not before the court, the trial court noted in dicta that Schlesinger had compensated Herman for her stock by making payments on her Mercedes. The court noted that in her motion to intervene (which was denied), Herman stated that "with the exception of the use of a Mercedes Benz automobile, [she] received no consideration for the transfer of her stock interest." On appeal, Herman calls this clearly erroneous, claiming that the Mercedes was part of a divorce settlement. We need not address this, however, as it was dicta and is immaterial to the district court's finding that any enrichment resulting from Herman's alleged impoverishment enured to the benefit of Schlesinger, not the defendants. This ultimate finding is supported by Herman's own testimony that it was her understanding that she and Schlesinger would "settle up later." It is not clearly erroneous.

## V. *Sanctions*

Finally, the appellants challenge the district court's denial of two motions for sanctions. Prior to trial, Schlesinger filed a motion for sanctions alleging that certain documents had been back-dated to 18 July 1990, when in fact the documents were drawn and signed after Schlesinger's employment was terminated in September 1990. Specifically, Schlesinger alleged that the defendants back-dated (1) the minutes of the board meeting at which the board ratified the agreement to pay Schlesinger $400,000 and one percent ownership, (2) the document reflecting this ratification, and (3) the stock certificate for 100 shares (one percent) issued to Schlesinger. The district court deferred ruling on the motion until the conclusion of trial. After trial, on the same date that the court rendered its opinion, the court denied the motion as "inappropriate and unwarranted." The appellants complain on appeal that the court failed to give specific reasons for denying the motion. We disagree. In light of the detailed opinion issued the same day as the ruling, this is hardly abuse of discretion. *See Hogue v. Royse City,* 939 F.2d 1249, 1256 (5th Cir.1991).

The appellants' second motion for sanctions was made orally on the third day of trial, after the defendants produced a copy of the WAM stock certificate issued and signed by Schlesinger on

19 April 1990, the date of the merger. From the start of the litigation, Schlesinger consistently denied receiving any stock in the new corporation, arguing that it was not offered until after he was terminated in September 1990, at which time he refused to accept it. The defendants maintained invariably that a certificate was tendered to and accepted by Schlesinger on the date of the merger. When the defendants produced the copy at trial and admitted that they had discovered it six weeks earlier, the plaintiffs moved for sanctions arguing nondisclosure. The plaintiffs, however, had not requested production of the certificate or of copies. The defendants were under no obligation to disclose that which was not requested. Thus, the motion for sanctions was completely without basis in law or fact, particularly in light of the defendants' constant position and Schlesinger's vehement denial that the certificate had been issued. The court did not abuse its discretion.

The rulings and judgment of the district court are AFFIRMED.