**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 95-20443**
_____

**RICARDO ALDAPE GUERRA,**

**Petitioner-Appellee,**

**versus**

**GARY L. JOHNSON, DIRECTOR, TEXAS**
**DEPARTMENT OF CRIMINAL JUSTICE,**
**INSTITUTIONAL DIVISION,**

**Respondent-Appellant.**

_____

**Appeal from the United States District Court**
**for the Southern District of Texas**
_____
**July 30, 1996**

Before GARWOOD, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Contending that the district court's factual findings of numerous instances of police and prosecutorial misconduct, including but not limited to the failure to disclose material, exculpatory evidence to the defense, are clearly erroneous, Gary L. Johnson, Director of the Texas Department of Criminal Justice, Institutional Division, appeals the grant of habeas relief to Ricardo Aldape Guerra, who was convicted of capital murder and sentenced to death in 1982. We **AFFIRM**.

On July 13, 1982, approximately two hours before midnight, Houston police officer J. D. Harris stopped his police car behind an automobile occupied by Guerra and Roberto Carrasco Flores (Carrasco), at the intersection of Edgewood and Walker Streets. Moments later, the Officer was shot three times in the head with a nine millimeter weapon and died shortly thereafter. Jose Francisco Armijo, who was near the intersection in an automobile with two of his children (one of whom, then ten years of age, was a key witness against Guerra at trial), was also shot in the head with a nine millimeter weapon and died later.

Witnesses informed police that the suspects might be found in the same neighborhood, at 4907 Rusk Street (Guerra's address). About one and one-half hours after Officer Harris was shot, Officer Trepagnier approached a garage next to that address. Using a nine millimeter weapon, Carrasco shot and seriously wounded the officer. Carrasco was killed in the ensuing exchange of gunfire with police. The nine millimeter weapon was found under Carrasco's body, and Officer Harris' service revolver was found under Carrasco's belt, along with another clip for the nine millimeter weapon.

Guerra was arrested moments after Carrasco was shot, when officers found him hiding nearby. A .45 caliber pistol was found within Guerra's reach.

Although the physical evidence pointed to Carrasco as Officer Harris' killer, Guerra was charged with capital murder on the basis

of eyewitness identification.  (The State did not seek to convict Guerra under the law of parties.)

In October 1982, three months after the murder, a jury found Guerra guilty, rejecting his defense that Carrasco shot Officer Harris; he was sentenced to death.  The Texas Court of Criminal Appeals affirmed in 1988, *Guerra v. State*, 771 S.W.2d 453 (Tex. Crim. App. 1988); and the next year, the Supreme Court denied Guerra's petition for a writ of certiorari.  *Guerra v. Texas*, 492 U.S. 925 (1989).

Guerra filed for habeas relief in the state trial court in May 1992.  Following the appointment of new counsel that July, he filed an amended application in mid-September.  Four days later, the trial court, without conducting an evidentiary hearing and making findings of fact or conclusions of law, recommended denial of relief.  In January 1993, the Texas Court of Criminal Appeals accepted the recommendation and denied relief.

Shortly thereafter, in February, Guerra sought federal habeas relief.  The district court conducted an extensive evidentiary hearing that November, and, a year later, in November 1994, entered an order granting relief.  The order was amended the next May, *Guerra v. Collins*, 916 F. Supp. 620 (S.D. Tex. 1995), and the respondent was ordered to release Guerra unless the State began retrial proceedings by arraigning him within 30 days.  Our court stayed the judgment.

II.

As stated, the physical evidence led directly to Carrasco as Officer Harris' murderer. An obvious, critical question is why, if Guerra instead shot the Officer, the murder weapon (not to mention the Officer's service revolver) was found under Carrasco's body one and one-half hours after the Officer was shot. At oral argument, the respondent espoused the theory that, when Guerra and Carrasco exited their vehicle after the Officer pulled up behind them, they picked up each other's weapons, and then exchanged them after the murder. In light of this theory, it goes without saying that the next question that follows immediately is why, if Guerra shot the Officer, Carrasco would have been willing to take back and keep a weapon just used to kill a policeman. Among other obvious reasons for not wanting to be found with a murder weapon is the fact that it is common knowledge that anyone who kills a law enforcement officer will be quickly, vigorously, and aggressively pursued, as reflected by the events in this case.

The State relied on this exchanged weapons theory at trial. In closing argument, the prosecutor stated:

> I don't have to prove to you how ... Guerra came in possession of that nine-millimeter pistol....
>
> ....
>
> There is no way that I had any type of equipment set up inside of that vehicle to show you what was done inside that vehicle and how the weapons could have gotten into this man's [Guerra's] hands, but you know one thing from listening to the evidence, and you know

- 4 -

one thing from listening to when Ricardo Guerra testified. He didn't always keep his pistol tucked into his belt.

Do you recall, right towards the end of his testimony, I asked him, "When you went into the store to get those Cokes [before the shooting], did you still have that pistol tucked inside your belt with your shirt covering it?"

"No, I put it under the seat," and I think you can use your common sense ....

Do you think these guys are driving around and they've got those guns tucked in their belts? They take them out and set them on the seat ....

Do you think perhaps when they got out of the car, they picked up the wrong gun?

The record, however, contains little, if any, evidence to support this theory. Obviously, this was a critical fact issue at trial. As discussed *infra,* the State's non-disclosure of exculpatory information concerning this issue was one of the bases upon which the district court granted habeas relief.

At trial, Guerra testified that, on the night of the shooting, he and Carrasco went to the store; that Carrasco had a nine millimeter pistol which he was carrying at his belt; that he (Guerra) also was carrying a gun; that he put his gun under the car seat when he went into the store; that he put it back in his trousers when he got back to the car; and that the gun was in his belt when he got out of the car after Officer Harris arrived at the intersection.

On cross-examination at trial, Guerra denied that he and Carrasco took their guns out of their belts and put them on the

seat while they were driving around.  He testified further that Carrasco, whom he referred to by the nickname "Werro" (spelled various ways in the record; according to the respondent at oral argument, it meant "the blond one" or "the light-skinned one"), shot Officer Harris and took the Officer's gun; that they ran back to Guerra's residence (4907 Rusk Street); and that, when they arrived, Carrasco had two weapons -- his own (the nine millimeter) and the Officer's.

Two of Guerra's roommates testified at trial that, shortly after Officer Harris was shot, Carrasco ran into the house and said that he had killed a policeman; and that Carrasco had the policeman's gun in his belt and another gun in his hand.  One roommate testified further that, when Guerra arrived a minute or two later, Guerra said that Carrasco had just killed a policeman.

Two of the State's strongest witnesses at trial were Jose Armijo, Jr. (the then ten-year-old son of the man fatally wounded at the same intersection immediately after Officer Harris was killed), who testified that Guerra shot Officer Harris and his father, and Hilma Galvan, who testified that she saw Guerra shoot Officer Harris.  Neither testified, however, at the federal evidentiary hearing.

The district court held that Guerra's due process rights were violated based on findings that, *inter alia*, (1) police and prosecutors threatened and intimidated witnesses in an effort to suppress evidence favorable and material to Guerra's defense; (2) police and prosecutors used impermissibly suggestive identification

procedures, such as permitting witnesses to see Guerra in handcuffs, with bags over his hands, prior to a line-up, permitting witnesses to discuss identification before, during, and after the line-up, conducting a reenactment of the shooting shortly after it occurred so that witnesses could develop a consensus view, and using mannequins of Guerra and Carrasco at trial to reinforce and bolster identification testimony; (3) police and prosecutors failed to disclose material, exculpatory evidence to the defense; (4) prosecutors engaged in misconduct at trial, including soliciting and encouraging witnesses to overstate or understate facts, falsely accusing a defense witness of either being drunk or having "smoked something" because he yawned during his testimony, questioning a defense witness about an extraneous murder which the prosecutors knew was a false rumor, and making improper closing argument; and (5) a court interpreter inaccurately translated witnesses' trial testimony.

Because the state habeas court did not make findings of fact, the statutory presumption of correctness for such findings is not in play. (The 28 U.S.C. § 2254(d) presumption of correctness has been redesignated as § 2254(e)(1) in the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. NO. 104-132, § 104(3), 110 Stat. 1214, 1219 (1996).) In fact, the only issue raised here is the contention that "the district court's factual findings that the police and prosecutors engaged in misconduct depriving Guerra of due process ... are clearly erroneous." As a result, the respondent conceded at oral argument that, if those findings are

not clearly erroneous, then a due process violation occurred. (Inconsistent with the statement of the issue and the concession at oral argument, the respondent's brief contains assertions that certain factual findings, even if not clearly erroneous, are legally irrelevant. We conclude that habeas relief is warranted by legally relevant factual findings that are not clearly erroneous.)

To restate the well-known standard, a factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (citation omitted). Along that line, in a case such as this, which turns almost exclusively "on determinations regarding the credibility of witnesses, [FED. R. CIV. P.] 52(a) demands even greater deference to the trial court's findings." *Id*. at 575. Similarly, "[w]here the court's finding is based on its decision to credit the testimony of one witness over that of another, that finding, if not internally inconsistent, can virtually never be clear error." *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (internal quotation marks and citation omitted). Three examples more than suffice to demonstrate why, based on our review of the record, there are sufficient legally relevant, non-clearly erroneous findings of fact to warrant habeas relief.

The district court found that, in interviews with police and prosecutors, three witnesses, all then under the age of 18 (Herlinda Garcia (14), Patricia Diaz (17), and Frank Perez (17)),

gave police and prosecutors material exculpatory information that was not disclosed to the defense. Such non-disclosure is violative of due process if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See* **United States v. Bagley**, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); **id**. at 685 (White, J., concurring in part and concurring in judgment); *see also* **Kyles v. Whitley**, __ U.S. __, 115 S. Ct. 1555 (1995). As noted, for these three examples, because, with slight exception, the respondent presents only a factual issue, our review is a most narrow one -- were the findings of fact underlying a due process violation because of the non-disclosure clearly erroneous.

Garcia, who identified Guerra at trial as Officer Harris' murderer, testified instead at the federal evidentiary hearing that she told police and prosecutors that she saw Carrasco pull something out of his trousers and point at Officer Harris with both hands clasped together in front of him; that Carrasco was standing a "couple of feet" away from the Officer; that she saw flames coming out of Carrasco's hands; and that, when she heard the shots, she saw Guerra leaning toward the police car, near the front, with his empty hands on the hood. This information was not included in Garcia's written statement, nor was it disclosed to the defense. Garcia, who, as noted, was 14 years of age at the time of the shooting, testified further that she was intimidated into identifying Guerra as the shooter by police warnings that her

common-law husband, a parolee who was over 18 years of age, could be adversely affected if she did not cooperate.

The respondent contends that Garcia's testimony is not credible because her written statements prepared by the police were consistent with her trial testimony, even though she had not read her statements before trial, and because, if the police were trying to coerce witnesses to identify Guerra as the shooter, they would not have allowed Garcia to describe the shooter, both in her statement and at trial, as having blond hair and wearing a brown shirt and brown trousers.  (Guerra had dark hair and was wearing a green shirt and blue jeans at the time of the shooting; Carrasco also had dark hair (but, as noted, was commonly referred to as "Werro", the "blond one" or "light-skinned one") and was wearing a purple or maroon shirt and brown trousers.)

Finding that Garcia's habeas testimony was credible, the district court found further that she had been intimidated by police and prosecutors, and that the police omitted material exonerating information from her written statement.  We will declare testimony incredible as a matter of law only when it "is so unbelievable on its face that it defies physical laws." *United States v. Casteneda*, 951 F.2d 44, 48 (5th Cir. 1992) (internal quotation marks and citation omitted).  As the district court noted, Garcia's testimony is consistent with the physical evidence that Carrasco, rather than Guerra, shot Officer Harris. Accordingly, we cannot conclude that the court clearly erred by finding that Garcia told the truth at the evidentiary hearing.

Patricia Diaz, who, as noted, was 17 years of age when she testified at trial, testified at the evidentiary hearing that she told police and prosecutors that, an instant after she heard shots, she saw Guerra on the driver's side of the police car, near the front, facing that car, with his empty hands on its hood, as if he were about to be searched; and that she did not see anyone shoot Officer Harris. But, her description of Guerra's location and his empty hands was not included in her written statements prepared by the police. Diaz testified further that, contrary to what is included in her first written statement, she did not tell the police that she saw a man from Guerra and Carrasco's car "pointing a gun in the direction of the police car, and I saw him shoot four times at the police car"; nor, contrary to what is included in her second written statement, did she tell the police, after the line-up, that she saw Guerra "with his hands outstretched, and I guess he had a gun in his hands". Diaz testified that she signed her statements without reading them because she was tired and because she was frightened by police threats to take her infant daughter from her if she did not cooperate.

The respondent maintains that Diaz's habeas testimony is not credible because, again, her trial testimony was consistent with her statements, even though she never read them. The respondent asserts that if, as Diaz testified at the evidentiary hearing, she had demonstrated at trial how Guerra was "pointing" by stretching her arms out in front of her with her palms open and down, the prosecution would have clarified her testimony, or the defense

would have capitalized on it.  The district court found, however, that Diaz's trial testimony was the product of police intimidation, and was tainted by the prosecutor's inclusion in his questions of incorrect statements of Diaz's prior testimony.  Again, because there is evidence in the record to support these findings, we cannot conclude that they are clearly erroneous.  Restated, "[i]f the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573-74.

Finally, Frank Perez, who, as noted, was 17 years of age when he testified at trial, testified at the federal evidentiary hearing that it "could have been anywhere from 30 seconds to a minute and a half" after he heard gunshots that he saw two men run past his house; but, he was "not really sure exactly how long it was". Perez's statement to the police the day after the shooting reports that he saw a Mexican American male run past his house "[j]ust a short time after the gun shots"; at trial, he testified that "it might have been a minute or less than that, or maybe a little over a minute", that he "couldn't really place the time".

Perez testified further at the federal hearing that he told the police and prosecutors that he could not identify the first man, who appeared to have been running on the south side of Walker Street (as noted, this was one of the streets forming the intersection where the shooting occurred); that the second man,

whom he identified as Carrasco, appeared to have been running on the north side of that street; that, as Carrasco ran past, he pointed his left hand at Perez; that Carrasco put his left hand behind his back and then dropped an object that looked like a nine millimeter gun with a clip; that the object hit the street, making a metallic scraping sound; and that Carrasco picked up the object with his left hand and continued running down the street. Perez's written statement, prepared by the police, did not include that Carrasco appeared to be coming from the north side of Walker Street, or that the gun appeared to be a nine millimeter, or that Carrasco used his left hand both to point the gun at Perez and to pick up the gun. The word "gun" was typed in Perez's written statement, but, according to Perez, was changed to "object" after the police told him not to use the word "gun" unless he was 100% certain that the object was one.

The respondent does not challenge Perez's credibility; instead, he contends that, because the defense had Perez's written statement -- with "gun" changed to "object" -- when it cross-examined him at trial, the district court erred by finding that the prosecution suppressed Perez's statement that Carrasco dropped a gun. But, the respondent does not address the other information that the district court found to have been omitted from Perez's statement (that Carrasco appeared to be coming from the north side of Walker Street, that the gun appeared to be a nine millimeter, and that Carrasco used his left hand to point the gun at Perez and to pick it up after he dropped it). Obviously, that information

- 13 -

was material, because, according to it, Carrasco had the nine millimeter murder weapon shortly after the shooting. Moreover, the information is consistent with other evidence presented at the federal evidentiary hearing that there was a scratch on the nine millimeter weapon, consistent with it having been dropped; that the shooter ran from the scene on the north side of Walker Street; and that the shooter was left-handed (there was evidence at the federal hearing that Guerra is right-handed; this was not brought out at trial). As noted, the respondent challenges neither the correctness of the district court's factual finding that this information was suppressed, nor its materiality.

These three examples of non-disclosure, without more, are sufficient, on the facts of this case, to support a due process violation mandating habeas relief. We need not discuss further examples of the lack of clear error in the district court's detailed factual findings. In sum, we are satisfied that more than sufficient non-clearly erroneous, legally relevant findings of fact support such relief.

### III.

For the foregoing reasons, the judgment is

*AFFIRMED*.