United States Court of Appeals,

Fifth Circuit.

No. 93-1880.

7547 CORPORATION and Sonem Partners, L.P., Plaintiffs-Appellants,

v.

PARKER & PARSLEY DEVELOPMENT PARTNERS, L.P. et al., Defendants-Appellees.

Nov. 18, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before KING, JOLLY and STEWART, Circuit Judges.

KING, Circuit Judge:

The plaintiffs-appellants challenge the district court's summary adjudication of their claims under federal and state securities laws and under the common law for breach of fiduciary duty, waste, and conversion, based upon its conclusion that the plaintiffs lacked the requisite standing to pursue those claims. We affirm the trial court's disposition of the state law claims and the claim for violation of federal proxy laws, but reverse its judgment with respect to the remaining federal securities claims.

I. Background

The plaintiffs, 7547 Corporation ("7547 Corporation") and Sonem Partners, L.P. ("Sonem") (together referred to as the "plaintiffs"), were the beneficial owners of units in a limited partnership known as Parker & Parsley Development Partners, L.P. ("PDP"), an oil and gas master limited partnership organized under the laws of the State of Texas and listed on the American Stock Exchange. PDP established operations in December 1987 through the exchange of 3.9 million units for interests in 32 oil and gas limited partnerships. As of March 30, 1990, the number of PDP units outstanding had risen to 5.2 million. PDP was apparently managed by its sole general partner, Parker & Parsley Development Corporation ("PPDC"), which was in turn owed by Southmark Corporation ("Southmark"). PPDC sponsored several public development drilling partnerships from which it received substantial management fees and operating revenues. PPDC also received promotional interests in the partnerships in exchange for its services.

In 1989, Southmark provided severance packages to its two top officers which included the option to acquire PPDC for the higher of book value or appraisal value by April 24, 1989. In the event these two officers did not exercise the purchase option, nine other PPDC officers—including the individual defendants, Scott D. Sheffield ("Sheffield"), Herbert C. Williamson, III ("Williamson"), and Timothy M. Dunn ("Dunn")—were granted an option to purchase PPDC within 80 days. These officers will be referred to collectively as the "management group." The purchase option eventually inured to the management group, but, as they were unable to obtain third-party financing for the transaction, they could not complete the purchase. The plaintiffs claim that the individual defendants consequently devised an elaborate scheme whereby they could effectively obtain the benefits of PPDC ownership—i.e., a substantial portion of its income—without personally having to purchase it. The remainder of events described below are alleged to have been conceived and precipitated by these individuals in furtherance of the scheme, and, as noted below, we review these allegations in a light most favorable to the non-movant plaintiffs.

A. The Stock Purchase Scheme

In May of 1989, Southmark and certain of its affiliates entered into a stock purchase agreement (the "purchase agreement") with PDP, PPDC, and Parker & Parsley, Ltd. ("P & P Ltd.") for the purchase of PPDC's outstanding stock. The agreement was subsequently consummated as follows: PPDC transferred its general partnership interest in PDP to P & P Equity, which in turn was managed by PPDC as general partner. P & P Ltd. then acquired PPDC's general partnership interest in P & P Equity. JM Petroleum Corporation ("JM"), the sole limited partner of P & P Ltd., provided the financing for the transaction and received in exchange a profits interest in P & P Ltd. and a $3 million liquidation preference. According to documents filed with the Securities and Exchange Commission ("SEC"), P & P Ltd. used $2 million of the JM financing to acquire PPDC's general partnership interest in P & P Equity, and P & P Equity in turn caused PDP to acquire all of the outstanding stock in PPDC for an aggregate price of $52.6 million. The plaintiffs contend that the purchase price also included the assumption of a $16.8 million debt. At the proverbial end of the day, (i) PDP had purchased its own general partner, PPDC, (ii) P & P Equity was the sole general partner

of PDP, (iii) P & P Ltd was the sole general partner of P & P Equity, and (iv) Midland Management Partners, L.P. ("Midland") was the sole managing general partner of P & P Ltd.

The plaintiffs point out that P & P Equity is a Texas limited partnership whose sole limited partner is Spraberry Development Corporation ("SDC"), an entity owned by the individual defendants. SDC is also a non-managing general partner of P & P Ltd. Further, the individual defendants are general partners of Midland. The plaintiffs claim that the interrelationship between these entities has allowed the individual defendants to gain control of PPDC and its substantial income.

Additionally, the defendants allegedly caused PDP to engage in transactions with its affiliates which were much less favorable to PDP than would have been received in arms-length transactions. Specifically, on May 24, 1989, P & P Ltd. entered into a master crude oil purchase agreement (the "crude oil agreement") with JM, its sole limited partner, which required P & P Ltd. and all of the entities controlled by P & P Ltd. to sell all crude oil (including condensate) which any of the entities had the right to market after the effective date of the agreement, July 1, 1989. The price agreed upon in the crude oil agreement was to be a monthly weighted average price per barrel equal to JM's posted price for crude oil of the same type and quality produced from the same field or area, plus, at P & P Ltd.'s option, a supplemental payment of five cents per barrel or a letter of credit to secure payment. This price is contended to be significantly below the price that could have been obtained on the open market and has allegedly injured PDP, which sold over $5 million of oil to JM in the second half of 1989 alone and approximately 657 of the crude oil it produced in 1990.

B. The Limited Partnership Revenues

During the 1980s, PPDC sponsored several oil and gas drilling programs. By mid-1989, the eighteen limited partnerships organized under PPDC's eight public programs had raised approximately $258 million of capital from subscribers. PPDC also sponsored 5 private partnerships raising approximately $35 million in capital during the period between 1985-88. As sponsor and managing general partner of these partnerships, PPDC received substantial management and operation fees, as well as revenues from its promotional interests in the partnerships.

In mid-1989, PPDC and P & P Ltd. jointly offered a ninth series of public programs via a prospectus dated August 1, 1989 (the "ninth series"). Under the joint arrangement, PPDC and P & P Ltd. agreed to share management fees and other compensation and reimbursement. P & P Ltd. was to contract with PPDC to perform the operating services for which PPDC would be reimbursed at cost—i.e., less than 507 of the total compensation and reimbursement. Liabilities for organization and offering expenses exceeding two and one-half percent of aggregate initial partner contributions were allocated entirely to PPDC. The plaintiffs argue that P & P Ltd. will receive tens of millions of dollars in management fees and other compensation, even though the management and operating services will in actuality be performed by PPDC employees.

C. The Roll-Up Scheme

The plaintiffs complain of the proposed transaction whereby the assets, liabilities, and operations of PDP, P & P Ltd., and Damson Oil Corporation and its affiliates ("Damson") were to be combined into a newly-formed corporation, Parker & Parsley Petroleum Company ("P & P Petroleum"), in exchange for stock in the new corporation (the "roll-up transaction" or "transaction"). Under this plan, the Parker & Parsley entities were then to be liquidated in accordance with their respective partnership agreements and the P & P Petroleum stock distributed to the former unitholders of the "rolled-up" partnerships who relinquished their partnership interests. The agreements necessary to effect the transaction—the amended and restated exchange agreement entered into by PDP, P & P Equity, PDP Ltd., Midland, and others (the "exchange agreement") and the plan of consolidation respecting the Parker & Parsley partnerships (the "P & P plan")—were executed in December 1990. Because the transaction required approval by PDP's limited partners, the general partner of PDP solicited their votes on, and recommended approval of, the transaction through a Prospectus/Proxy Statement dated December 31, 1990. The Prospectus/Proxy Statement also delineated the terms of the offering of P & P Petroleum stock.

The parties intended that P & P Petroleum would continue the partnerships' activities of sponsoring public and private oil and gas development drilling and income programs after the roll-up transaction was consummated.

1. Distribution of P & P Petroleum common stock

The Prospectus/Proxy Statement provided that "*[e]ach holder of PDP units will receive 2 shares of [P & P Petroleum] Common Stock for each PDP unit [owned]* " (emphasis in original), and that P & P Ltd. would receive 2.3 million shares of the common stock (assuming 1007 participation) and 1.9 million shares of the common stock (if only the P & P partnerships participated).

The plaintiffs contend that the allocation of stock in the new corporation is unfair to them. Specifically, they claim that P & P Ltd. will receive a disproportionately higher percentage of P & P Petroleum common stock than it would have received in an arms-length transaction—at the expense of PDP. Consequently, when the respective companies are liquidated and the P & P Petroleum stock distributed, the plaintiffs will receive far less than that to which they would have been entitled if the transaction were handled without any conflicts of interest or self-dealing.

The plaintiffs take issue with several of the justifications given for the allocation scheme which, in their view, will have the inequitable and inevitable result that the value of the P & P Petroleum common stock to be received by PDP unitholders is substantially less than the per-unit liquidation value of PDP. First, in calculating the number of shares of P & P Petroleum to be allocated to the PDP unitholders, PDP's oil and gas reserves were valued as of December 31, 1989, whereas in calculating the number of shares to be allocated to P & P Ltd., the P & P Ltd. oil and gas reserves were valued as of September 30, 1990. This difference as to valuation dates is claimed to have affected the estimates profoundly because the invasion of Kuwait by Iraq in August of 1990 precipitated a significant rise in the price of oil globally. According to the plaintiffs, the price of oil in effect as of September 30, 1990, was $38.25 per barrel, while the price in effect as of December 31, 1989, was only $20.50 per barrel. Consequently, if the estimation of P & P Ltd.'s reserves had been made as of December 31, 1989, the reserves would have been worth approximately half of what they were worth in September of 1990.

Another asserted contributing factor to the disparity in the proposed stock allocations is the fact that the management fees, operating fees, and other revenues from the ninth series partnerships—which are claimed to have been misappropriated by P & P Ltd. from PDP in the first

place—were taken into account in determining the value of P & P Ltd. and the corresponding number of shares allocated to P & P Ltd. In other words, the plaintiffs contend that P & P Ltd. compounded its evil in misappropriating PDP's management fees, operating fees, and other substantial revenues by using those assets to justify allocating to P & P Ltd. a considerably greater portion of the P & P Petroleum common stock pursuant to the proposed roll-up transaction.

Finally, the plaintiffs argue that the P & P proposal inequitably allocates all fees and expenses incurred by the Parker & Parsley partnerships as a result of the roll-up to PDP alone. These factors, individually and in the aggregate, are claimed to affect disproportionately the number of shares allocated to PDP unitholders.

## 2. The Prospectus/Proxy Statement

Because the P & P plan includes a proposed amendment to the PDP partnership agreement, the general partner of PDP solicited proxies from its limited partners to be voted at a special meeting which was scheduled to take place on February 19, 1991. The plaintiffs claim that the Prospectus/Proxy Statement was materially false and misleading, and that these deficiencies similarly tainted the registration statement which contained the Prospectus/Proxy Statement and was filed with the SEC. Specifically, the section of the Prospectus/Proxy Statement which discussed in detail the allocation of P & P Petroleum shares to be apportioned to PDP and P & P Ltd. (the "allocation section") describes six categories of factors and assumptions determined by P & P Ltd., with the assistance of Dean Witter, to be material to the respective valuations of these partnerships, concluding that:

> [t]aking into consideration all the terms of the Transaction and other relevant factors, P & P Ltd. determined that the shares of [P & P Petrol eum] Common Stock to be issued to the Parker & Parsley partnerships pursuant to the Transaction should be allocated 81.847 to the holders of PDP Units and 18.167 to P & P Ltd. (in the case of 1007 Participation) and 84.57 to the holders of PDP Units and 15.57 to P & P Ltd. (in the case of P & P Only Participation).

The Prospectus/Proxy Statement, however, does not disclose exactly how the stock allocation was determined. According to the plaintiffs, the Prospectus/Proxy Statement failed to make adequate disclosure about numerous points of interest to the investors, including (i) other potential methodologies for valuation, (ii) comparable valuations with similar companies, (iii) the

disproportionate burden of costs of the roll-up transaction which were to be borne by PDP,[1] (iv) changes in the asset value of PDP between December 31, 1989, and September 30, 1990, and the resulting effect upon PDP's valuation for the allocation scheme, (v) the SEC-10 value of P & P Ltd.'s oil and gas reserves as of December 31, 1989, (vi) the liquidation value of PDP and the benefits of a corporate conversion of PDP alone to PDP's investors, and (vii) the full extent of the relationship between Dean Witter and the defendants. In light of these and other omissions and misrepresentations, as well as the valuation problems discussed above, the plaintiffs maintain that the Prospectus/Proxy Statement was materially misleading in representing that the aggregate consideration to be received by the Parker & Parsley partnerships was the "fair market value" of the assets of those partnerships.

### 3. The 1990 Repurchase Plan

In the first three quarters of 1990, PPDC purchased 5.67 of the total PDP units issued in December of 1989, some of which were acquired on the open market, thus making PPDC a 10.27 owner of its parent corporation. The plaintiffs characterize the holdings as being in PDP's treasury since they were held by PDP's wholly-owned subsidiary and assert that the reacquisition of PDP's units, which not surprisingly were voted in favor of the proxy proposal, substantially lessened the number of minority unitholders necessary to approve the Parker & Parsley plan. The plaintiffs argue that the purpose of these acquisitions should have been disclosed to them earlier on.

### D. The Instant Litigation

On September 6, 1990, Kaufmann filed this derivative action on behalf of PDP against P & P Equity, P & P Ltd., Midland, and the individual defendants. PDP was included as a nominal defendant. After the defendants filed a registration statement with the SEC on December 31, 1990, regarding the proposed roll-up transaction and disseminated the Prospectus/Proxy Statement to PDP

---

[1]Specifically, the plaintiffs point to a portion of the Prospectus/Proxy Statement which discusses certain benefits of the roll-up transaction to PDP unitholders. They complain that these statements were materially false and misleading in that they failed to disclose adequately the operations costs of P & P Petroleum, as well as substantial transaction costs (to be borne by PDP) which would appear to offset any such cost reductions.

unitholders, Kaufmann's assignee, 7547 Corporation,[2] and Sonem[3] filed an Amended Derivative and Class Action Complaint (the "amended complaint") on January 16, 1991, alleging derivative and direct claims under Texas law and federal claims under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (the "Securities Act") and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act").

The defendants moved to dismiss, or alternatively for summary judgment on, the amended complaint on the basis that the plaintiffs lacked standing to assert any of the claims described in it. An amended motion to dismiss and second amended motion to dismiss were later filed. The plaintiffs responded to these motions and filed two motions for class certification, both of which were ultimately denied as moot. After brief discovery relating to the issues of standing, the district court construed the defendants' amended motion to dismiss as one for summary judgment and granted it by order entered September 2, 1993. This appeal followed.

## II. Analysis

Standing issues abound in this case. The defendants have raised numerous challenges to the plaintiffs' standing to bring the claims asserted, including: (i) the inability to bring state law derivative claims because the plaintiffs were never admitted as limited partners; (ii) a lack of standing under the federal securities laws because the plaintiffs were neither "purchasers" nor "sellers" of the unit interests; (iii) the failure to show injury from any alleged deceptive activities; and (iv) an inability to assert violations of the federal securities laws governing the solicitation of proxies because the plaintiffs were not eligible to vote. These standing issues are obviously quite complicated and permeate all of the plaintiffs' causes of action; however, as the district court properly determined, their resolution is jurisdictional and therefore critical to our assessment of the case. *See Lujan v. Defenders of Wildlife,* --- U.S. ----, ----, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (characterizing standing as a "core component" of the case-or-controversy requirement of Article III);

---

[2] 7547 Corporation was assigned 100 PDP units by Kaufmann Alsberg & Co., Inc. ("Kaufmann") on December 17, 1990.

[3] Sonem purchased its PDP units on July 23, 1990.

*Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 117 (2d Cir.1991) ("Because standing is jurisdictional under Article III ..., it is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court.").

A. The Status of the Plaintiffs Under Texas Law

### 1. Derivative claims

The defendants argued below, and the district court agreed, that the plaintiffs had never been made limited partners of PDP and thus did not have standing under Texas law to assert derivative claims on behalf of the partnership. In the lower court's view, 7547 Corporation and Sonem, as assignees of limited partnership units, did not become "Substituted Limited Partners" as that term is defined in the PDP partnership agreement.[4]

The Texas Revised Uniform Limited Partnership Act permits a limited partner to bring a derivative action on behalf of a limited partnership, provided, among other things, that the plaintiff was a limited partner both at the time he brings the action and at the time of the transaction (or at least "had status as a limited partner aris[ing] by operation of law or under the terms of the partnership agreement from a person who was a limited partner at the time of the transaction"). TEX.REV.CIV.STAT.ANN. ART. 6132a-1, §§ 10.01, 10.02 (Vernon Supp.1994). The statute defines "limited partner" quite deferentially by reference to the operative partnership agreement. *E.g.,* TEX.REV.CIV.STAT.ANN. ART. 6132a-1, §§ 1.02(5), 3.01 & 7.04. A transferee of partnership interests can become a "limited partner":

> if and to the extent that:
>
> (1) the partnership agreement provides; or
>
> (2) all partners consent.

TEX.REV.CIV.STAT.ANN. ART. 6132a-1, § 7.04.

The PDP partnership agreement sets forth the procedure by which a transferee of limited partnership units can become a limited partner. First, the transferee must receive the units and the

---

[4]The relevant partnership agreement is the Second Amended and Restated Agreement of Limited Partnership of Parker & Parsley Development Partners, L.P., effective as of September 1, 1989 (the "partnership agreement").

power to seek admission from its assignor. It must then deliver an executed transfer application to the transfer agent which includes certain requisite representations and agreements. Finally, the general partner must consent to the admission of the transferee as a "Substituted Limited Partner." That consent "may be granted or withheld in [the general partner's] sole discretion." However, the agreement also provides that consent may be "deemed" to have been given if the general partner does not expressly withhold its consent. It is undisputed that the general partner of PDP, P & P Equity, never gave its consent to the admission of Kaufmann, 7547 Corporation, or Sonem. In fact, in all three cases, it specifically withheld such consent. By letter dated September 14, 1990, P & P Equity expressly denied Kaufmann consent to be a limited partner. That "blackball" specifically extended to its affiliates and assignees, apparently including 7547 Corporation, which subsequently acquired its units from Kaufmann on December 17, 1990. Since the notice was delivered several months before Kaufmann assigned its units to 7547 Corporation, 7547 Corporation could not have become a limited partner even under the "deemed consent" provision. Moreover, the plaintiffs admit by affidavit that they never filed applications to be admitted as limited partners.

The plaintiffs offer several ways around their obvious problems with standing to sue derivatively. First, they contend that they should be treated effectively as limited partners for purposes of standing. Second, they complain that summary judgment was prematurely granted before they could obtain sufficient evidence to establish their standing to sue. Finally, they contend that they are entitled to assert direct claims against the general partner and other defendants. We address each in turn.

a. Equitable status as limited partners

With regard to the first argument, the plaintiffs maintain that "standing may be granted to one who is not a limited partner where, *inter alia,* the wrongdoers themselves prevented the person from becoming a limited partner in order to continue in their wrongdoing without challenge." While admittedly appealing, the plaintiffs cannot cite to any authority to support this novel theory that they "should" be granted standing as limited partners as a matter of Texas law. Although the plaintiffs' allegations, if true, may amount to egregious tale of mismanagement and/or deception, for several

reasons we are not persuaded that we should alter the clear language of the Texas statute to afford standing to the plaintiffs. First, the Texas statute bestows eligibility to sue derivatively only upon one who is a "limited partner," which status, as discussed above, is essentially defined by the partnership agreement. TEX.REV.CIV.STAT.ANN. ART. 6132a-1, § 10.01. Section 10.02 makes it even clearer that the derivative plaintiff must be a "*limited partner*" at the time of bringing the action. *Id.* at § 10.02[5] Further, the Texas statute reflects that there are significant, attendant legal consequences to becoming a limited partner which do not affect other interest-holders. *See* TEX.REV.CIV.STAT.ANN. ART. 6132a-1, § 7.02(b) (stating that an assignee of partnership interests who has not yet become a limited partner has no liability as a partner); *id.* at § 6.03 (setting forth the procedure by which a limited partner must withdraw from the partnership). Indeed, there are indications throughout the statute that the distinction between limited partners and mere assignees is critical to the statutory scheme. *Id.* at § 7.02 comment ("Assignability does not amount to free transferability of interest which might imperil partnership classification for federal income tax purposes; this is because the assignee does not automatically become a limited partner.... The section also prevents an assignee from becoming a partner, or exercising the rights of a partner, unless the agreement is otherwise.").[6] We can only conclude that the Texas legislature specifically determined not to include assignees and transferees among those with derivative standing and instead deliberately chose to allow a partnership agreement to define the persons upon whom standing to sue derivatively would be conferred. *E.g., Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734, 95 S.Ct. 1917, 1925, 44 L.Ed.2d 539 (1975) (Where legislative body expressly includes a term in one provision of law but not in another part of the same law, it is permissible to conclude that it omitted the term intentionally.). We cannot

---

[5]The failure to include other interest-holders as persons eligible to sue derivatively cannot be viewed as accidental; other sections affording rights to limited partners expressly include an "assignee of a partnership interest." *E.g.,* TEX.REV.CIV.STAT.ANN. ART. 6132a-1, § 1.07(d) (Vernon 1994) (right to inspect financial records of the company); *id.* at § 1.07(e) (right to obtain without charge copies of the partnership agreement, certificate of limited partnership, and tax returns).

[6]*Accord* TEX.REV.CIV.STAT.ANN. ART. 6132a-1, § 7.04 comment (observing that "[i]f the agreement allows assignees automatically to become limited partners, the free transferability of interests may imperil federal income tax classification as a partnership.").

override what we see to be the clear intent of the Texas statute in order to afford "equitable" standing to the plaintiffs in this case.

Further, our decision in *Griffin v. Box,* 910 F.2d 255 (5th Cir.1990), represents a serious impediment to the loose construction of the statute urged by the plaintiffs. In *Griffin,* the plaintiffs, who were transferees of certain depositary receipts evidencing ownership in the OKC Limited Partnership, were dissatisfied with the general partners' performance and began soliciting consents from other receipt holders to replace the general partners pursuant to a partnership agreement provision that allowed "limited partners" to take certain actions by written consents. *Id.* Despite the general partners' efforts to block the voting, the plaintiffs obtained over fifty percent of the outstanding votes and filed documents with the Texas Secretary of State to amend the partnership agreement in accordance with the vote. *Id.* at 258. The general partners sought injunctive relief to restrain the plaintiffs from interfering with management, which was granted upon the district court's finding that the receipt holders were not "limited partners" as defined under Texas law and the partnership agreement because the general partners had never given consent to their admission as limited partners. *Id.* at 258-59. This court affirmed, concluding that the partnership agreement requiring consent by the general partners was "clear and unequivocal" and, when read together with the provision bestowing complete discretion upon the general partners in this regard, "makes clear that ... no absolute right to the status of substituted limited partner exists." *Id.* at 260-61. *Griffin* confirms that one seeking to assert the rights of a limited partner must establish compliance with the partnership agreement's admission procedures and that the agreement controls the qualifications and rights of limited partners. *Id.* at 263.

The plaintiffs nonetheless draw our attention to cases which have permitted persons who are not technically "shareholders" to assert claims on behalf of a corporation and request that we extend their holdings by analogy.[7] The problem with doing so is that those cases do not construe the Texas

---

[7]*E.g., Hurt v. Cotton States Fertilizer Co.,* 145 F.2d 293, 295 (5th Cir.1944) (finding that legatee of stock had sufficient equitable interest to warrant standing to sue derivatively), *cert. denied,* 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945); *HFG Co. v. Pioneer Pub. Co.,* 162 F.2d 536, 540-41 (7th Cir.1947) (holding that beneficial owner of stock who was not a shareholder of record had standing to assert derivative claims on behalf of corporation);

law with which we are concerned. *Griffin,* on the other hand, does. For similar reasons, the cases which granted a right to limited partners to sue on behalf of the partnership even before such standing was conferred by statute[8] do not persuade us to bypass the clear language of the Texas statute.[9] In short, we disagree with the plaintiffs that "[t]here is no good reason why [they] should not be allowed to stand in the place of the limited partner or partners whose interests" were ultimately transferred to them.

### b. The request for more time

The plaintiffs' next theory, more fully developed at oral argument, was that the district court prematurely granted summary judgment without affording them additional time in which to obtain the necessary documents to support their standing. For example, the plaintiffs argue for the first time on appeal that they have recently uncovered a blanket consent to the admission of all unitholders as limited partners—except for Kaufmann—which was to be effective as of December 26, 1990 (the date fixed for determination of the record limited partners entitled to vote on the roll-up). In their view, this document would have substantiated their status as "substitute limited partners" with standing to sue. The plaintiffs admit that this document was not part of the record before the district court; accordingly, we may not consider it as a basis for reversing the district court's summary judgment. *Topalian v. Ehrman,* 954 F.2d 1125, 1131-32 n. 10 (5th Cir.) ("In reviewing a grant of summary judgment to determine whether the law was applied correctly, this court only considers papers that were before the trial court."), *cert. denied,* --- U.S. ----, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

---

*Gustafson v. Gustafson,* 47 Wash.App. 272, 734 P.2d 949, 953 (1987) (same).

[8]*E.g., Allright Mo., Inc. v. Billeter,* 829 F.2d 631, 635-36 (8th Cir.1987); *Jaffe v. Harris,* 109 Mich.App. 786, 312 N.W.2d 381, 384-85 (1981); *Riviera Cong. Assocs. v. Yassky,* 18 N.Y.2d 540, 277 N.Y.S.2d 386, 390-93, 223 N.E.2d 876, 879-80 (1966).

[9]Indeed, according to the Bar Committee comments on sections 10.01 and 10.02, the very purpose of the legislative action was to confer standing upon limited partners akin to that given to shareholders. TEX.REV.CIV.STAT.ANN. ART. 6132a-1, article 10 comment. The comments also reflect that "Texas courts [had] not previously considered whether partners have a right to sue derivatively...." *Id.* The fact that this statute was the first expression of any right to sue derivatively on behalf of a limited partnership further counsels against extending the privilege beyond the plain words of the law to reach other interest-holders.

To the extent that they argue that the document supposedly exemplifies the fact that summary judgment should have been deferred pending more discovery, that argument also fails. The proper procedural mechanism for obtaining a continuance of a summary judgment motion in order to pursue discovery to respond is set forth in Federal Rule of Civil Procedure 56(f).[10] The cases interpreting the rule elaborate three general requirements with which the non-movant must comply before obtaining a continuance: (i) a request for extended discovery prior to the district court's ruling on the summary judgment; (ii) a notice to the court that further discovery pertaining to the summary judgment motion is being sought; and (iii) an explanation as to specifically how the requested discovery pertains to the pending motion. *Wichita Falls Office Assocs. v. Banc One Corp.,* 978 F.2d 915, 919 (5th Cir.1992) (citation omitted), *cert. denied,* --- U.S. ----, 113 S.Ct. 2340, 124 L.Ed.2d 251 (1993). We are not directed to any portion of the record—nor have we found any independently—in which the plaintiffs made the requisite representations or even requested a continuance of the summary judgment motion pending further discovery, other than requests for brief extensions which were granted by the court below. Accordingly, we cannot say that the district court erred in granting summary judgment prematurely.

## 2. Direct claims

The plaintiffs alternatively argue that the "near total domination and influence" of P & P Equity over the operations and assets of PDP required them to repose trust and confidence in the general partner; thus, they reason, the breach of that trust affords them a direct action against the general partner. *See Texas Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 507-09 (Tex.1980) (holding that a fiduciary relationship exists where " "a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of

---

[10]Rule 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

FED.R.CIV.P. 56(f).

the one reposing confidence.' " (citations omitted)). The reference to Texas law is appropriate because this court has previously held that state law determines whether a shareholder may maintain a non-derivative action. *See Crocker v. FDIC,* 826 F.2d 347, 349 (5th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1075, 99 L.Ed.2d 235 (1988). We have no trouble in extending *Crocker* to the case presented, and conclude that state law is also appropriate to determine whether an action against the general partners of a limited partnership is derivative or direct.

We have not been pointed to, nor have we uncovered, any Texas cases dealing with the specific issue presented, namely, whether a unitholder or limited partner can sue directly for injuries suffered by the limited partnership. As the defendants point out, the problem with using general fiduciary duty cases to find a direct cause of action in this case is that the injury here was in essence suffered by the partnership. The cases are legion that a shareholder may not sue directly for breaches of duties by officers and directors of a company because those injuries are actually suffered by the corporation. *E.g., Wingate v. Hajdik,* 795 S.W.2d 717, 719 (Tex.1990); *see also Lewis v. Knutson,* 699 F.2d 230, 237-38 (5th Cir.1983); *cf. Abeloff v. Barth,* 119 F.R.D. 332, 334 (D.Mass.1988) (claims for breaches of duty by general partner of limited partnership belong to the entity, not to the partners). The principle underlying this theory is that, when an injury is suffered by the corporation,

> each shareholder suffers relatively in proportion to the number of shares he owns, and each will be made whole if the corporation obtains restitution or compensation from the wrongdoer.... Such action must be brought by the corporation ... in order that the damages so recovered may be available for the payment of the corporation's creditors, and for proportional distributions to the stockholders....

*Wingate,* 795 S.W.2d at 719 (quoting *Massachusetts v. Davis,* 140 Tex. 398, 168 S.W.2d 216, 221 (1942), *cert. denied,* 320 U.S. 210, 63 S.Ct. 1447, 87 L.Ed. 1848 (1943)); *cf. Gabrielsen v. BancTexas Group, Inc.,* 675 F.Supp. 367, 373 (N.D.Tex.1987) (observing that, where the entity suffers injury because of the alleged misconduct of its management, the holder of an interest has no standing to bring a direct civil action against the management).

This same principle has been applied to require derivative action where an injury is in reality suffered by a limited partnership. *See Attick v. Valeria Assocs., L.P.,* 835 F.Supp. 103, 110-11 (S.D.N.Y.1992); *Strain v. Seven Hills Assocs.,* 75 A.D.2d 360, 429 N.Y.S.2d 424, 432 (1980) ("[A]

limited partner's power to vindicate a wrong done to the limited partnership and to enforce redress for the loss or diminution in value of his interest is no greater than that of a shareholder of a corporation."); *Abeloff,* 119 F.R.D. at 334. We find the reasoning of these authorities instructive and predict that a Texas court would likely consider the state law claims presented to be derivative. Indeed, the fact that Texas now has a statute expressly allowing limited partners to sue derivatively on behalf of the partnership—and thus making their status more equivalent to that of a shareholder—leads us to believe that a Texas court would likely be hesitant to allow a limited partner (much less a unitholder) to sue directly for wrongs suffered in reality by the partnership.

Moreover, the facts of this case present an even more forceful argument for finding derivative harm only. The plaintiffs describe their damages as follows:

> [The defendants] have engaged in a complex and sophisticated scheme and common course of conduct to wrongfully misappropriate for themselves millions of dollars in fees, properties, and interests rightfully belonging to PDP and 28,000 PDP Unitholders.

They also contend that, pursuant to the roll-up transaction:

> [T]he common stock of [PDP Petroleum] will be unfairly allocated between PDP and P & P Ltd. with P & P Ltd. receiving a far greater percentage of the common stock than it would have received in an arm's length transaction.

The injuries alleged by the plaintiffs are therefore collective injuries suffered by the partnership. That the disparities will eventually be passed on to the PDP unitholders upon liquidation of PDP does not commute the causes of action into direct claims on the plaintiffs' behalf; rather, the damages sought by the plaintiffs appear to be exactly like those indirect damages suffered by shareholders when a wrong is perpetrated upon the corporation. *E.g., Wingate,* 795 S.W.2d at 719; *see generally, Leach v. FDIC,* 860 F.2d 1266, 1269 (5th Cir.1988), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989); *FDIC v. Howse,* 802 F.Supp. 1554, 1561-62 (S.D.Tex.1992) (determination of whether claim is derivative turns on whether "all shareholders are "wounded' or just one person has been hurt by the misconduct.").

The plaintiffs point us to two cases in which they claim a fiduciary duty was found to be owed by the general partner to a unitholder or limited partner. *See Kellis v. Ring,* 92 Cal.App.3d 854, 155 Cal.Rptr. 297 (1979); *Eisenbaum v. Western Energy Resources, Inc.,* 218 Cal.App.3d 314, 267

Cal.Rptr. 5 (1990). These cases do not persuade us to permit a direct action here. *Eisenbaum* involved the breach of a duty owed directly to the limited partner, which has never been subject to the derivative action rule.[11] *See Wingate,* 795 S.W.2d at 719 (stating that the rule requiring derivative action for corporate injuries does not prohibit a stockholder from recovering damages where wrongdoer violates duty to stockholder individually); *Schoellkopf v. Pledger,* 739 S.W.2d 914, 918-19 (Tex.App.—Dallas 1987) (recognizing that stockholder may sue for violation of his own individual rights even though corporation may also have a claim), *rev'd on other grounds,* 762 S.W.2d 145 (Tex.1988); *Howse,* 802 F.Supp. at 1562; *cf. Crocker,* 826 F.2d at 349-50 (applying analogous Mississippi rule). With respect to *Kellis,* the California court merely speculated that "[i]t *may* be that upon proper pleading" the assignee could possibly maintain an action for injunctive relief and damages. 155 Cal.Rptr. at 300 (emphasis added). The court did not determine whether this possible action need be brought derivatively or directly. The dicta in *Kellis* does not compel us to find a direct action here.

In conclusion, we believe that the plaintiffs' state law causes of action are properly characterized as derivative, and our finding that Texas law does not permit the plaintiffs to bring derivative actions precludes the assertion of these claims.

B. Federal Securities Claims

The district court did not examine the federal securities claims individually—except for the asserted violations of the proxy rules—but rather disposed of them in its conclusion that the plaintiffs were not limited partners. We find that the tests for standing under these securities provisions do not overlap with the test for standing under Texas law and evaluate each claim separately below.

1. Section 11(a): registration liability

The record does not specifically reflect that the roll-up transaction was consummated or that the plaintiffs actually received stock in P & P Petroleum as a result; however, the parties appear to

---

[11]In *Eisenbaum,* the California plaintiff alleged that the defendant's predecessor, who was formerly a general partner of the limited partnership at issue, sold him interests in a Colorado limited partnership without disclosing that the sale had not been qualified under California law. *Eisenbaum v. Western Energy Resources, Inc.,* 218 Cal.App.3d 314, 267 Cal.Rptr. 5, 7-8 (1990).

operate upon this understanding.[12] The district court assumed for purposes of its decision that the transaction did occur, and we will therefore do the same—without prejudice, of course, to the defendants' ability to demonstrate to the court below on remand that the plaintiffs did not acquire shares of P & P Petroleum or otherwise lack standing to assert these claims. We review only the district court's holding that the plaintiffs did not have standing to sue under section 11(a) because they were not limited partners.

Thus operating on the presumption that the former PDP unitholders are now stockholders of P & P Petroleum, we look to see whether they have standing to assert claims under section 11 of the Securities Act, 15 U.S.C. § 77k(a), which creates liability for the issuance of registration statements containing false material facts or omissions of material facts.[13] The defendants maintain that "[o]nly persons who actually purchase shares pursuant to a defective registration statement have standing to file under Section 11," and reason that the plaintiffs fail to fit within this requirement.

The liability provision at issue permits "any person acquiring" a security issued pursuant to a defective registration statement to sue in law or in equity a variety of defendants. 15 U.S.C. § 77k(a). Case-law has limited the term "any person acquiring such security" to purchasers of shares issued and sold pursuant to the challenged registration statement. *E.g., Blue Chip Stamps,* 421 U.S. at 735-36, 95 S.Ct. at 1925 (observing that sections 11(a) and 12 of the Securities Act "are by their terms expressly limited to purchasers and sellers of securities"); *Klein v. Computer Devices, Inc.,* 591 F.Supp. 270, 273 (S.D.N.Y.1984), *clarified on reh'g,* 602 F.Supp. 837 (S.D.N.Y.1985). Thus, we

---

[12]Indeed, it is the defendants who point out in their briefs before this court that "there is no evidence in the Record to suggest that Sonem and 7547 [Corporation] do not continue to own stock in [P & P Petroleum]."

[13]Specifically, section 11(a) provides as follows:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, ***any person acquiring such security*** ... [may] sue [1] every person who signed the registration statement; [and] [2] every person who was a director of or partner in the issuer at the time of filing....

15 U.S.C. § 77k(a) (emphasis added).

turn to the definition of "sale" under the Securities Act, which provides that "[t]he term "sale' or "sell' shall include every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3). This section is generally interpreted to include exchanges of one security for another. *E.g. United States v. Wernes,* 157 F.2d 797, 799 (7th Cir.1946) (holding that offer to exchange beneficial trust certificates for limited partnership certificates constituted a "sale" for purposes of the Securities Act); *see also* II LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 1085 (1989) ("It is clear on the face of the [definitions contained in the Securities Act] that an exchange of one security for another is a sale."). In fact, certain exchanges—relating to exchanges in bankruptcy and exchanges blessed by governmental authorities after hearing, *see* 15 U.S.C. § 77c(a)(9) & (10)—are specifically exempted from the registration rules, indicating the presumption that, absent a tailored exemption, the transaction would be considered a "sale" and the Securities Act provisions would apply.

SEC Rule 145 further demonstrates that certain exchanges of securities—e.g., in connection with mergers and consolidations—are covered within the registration provisions of the Securities Act as constituting "sales." *See* Sec. Act Rule 145, 17 C.F.R. § 230.145(a)(2) & preliminary note (stating that "[t]he thrust of the rule is that a[ ] ... "sale' occurs when there is submitted to security holders a plan or agreement pursuant to which such holders are required to elect, on the basis of what is in substance a new investment decision, whether to accept a new or different security in exchange for their existing security.").[14] Rule 145 permits a "short-form" registration of securities issued as a result of a consolidation on SEC Forms S-4 or F-4. *See id.* (preliminary note). The securities exchange at issue was effected pursuant to both a Form S-4 registration statement and a prospectus, which, as discussed below, was addressed to PDP unitholders. These factors confirm that the transaction constituted a "sale" of securities for regulatory purposes of the Securities Act.[15] It would be

---

[14]The only exception to this rule is where the transaction is solely for the purpose of changing the issuer's domicile, *see* Sec. Act Rule 145(a)(1), 17 C.F.R. § 230.145(a)(2), an exception neither urged by the parties nor apparently applicable on this record.

[15]We assume that the parties would have informed the court if the roll-up had never been effectuated or if there had been a material change from the transaction described in the Prospectus/Proxy Statement. Our holding is limited to the proposition that unitholders who

inconsistent to find that the exchange of units of a limited partnership for stock in a newly-formed corporation is a "sale" for certain purposes of the Securities Act but not a "sale" for purposes of the private civil remedy to enforce those provisions.

Moreover, we note that the Prospectus/Proxy Statement itself refers to the "sale" of P & P Petroleum common stock:

> This Prospectus/Proxy Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities **other than [P & P Petroleum] Common Stock to which it relates**.... Neither the delivery of this Prospectus/Proxy Statement **nor any sale made hereunder** shall under any circumstances imply that information contained herein is correct at any time subsequent to its date. (Emphasis added).

The Prospectus/Proxy Statement also specifically recites that "*[e]ach holder of PDP Units will receive 2 shares of [P & P Petroleum] Common Stock for each PDP Unit he owns* (emphasis in original)." This document is obviously designed for two purposes: (i) to solicit proxies from eligible voters—i.e., limited partners—on the roll-up; and (ii) to serve as a prospectus describing the terms of the offered securities to all PDP unitholders (and Damson interest-holders). Presumably, this second purpose explains why the plaintiffs in the instant suit received copies of the Prospectus/Proxy Statement. Indeed, the document refers specifically both to "holder(s) of PDP Units" and to "limited partners," depending upon the context of the information given. For example, the discussions of voting rights and requirements refer only to "limited partners" of PDP, whereas the discussions of benefits and consequences of the transaction refer to "holders of PDP Units." Consequently, it is effectively addressed to all PDP unitholders whether entitled to vote on the roll-up or not.

The Prospectus/Proxy Statement defines "holders of PDP Units" as "holders of currently outstanding units of limited partner interest in PDP." Although we are not provided with "Appendix A" to the Prospectus/Proxy Statement which defines certain terms used throughout the prospectus, the partnership agreement is somewhat enlightening as to what "currently outstanding units of limited

exchanged PDP limited partnership units for stock in P & P Petroleum are "sellers" for purposes of the Securities Act. *See, e.g., Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 591 n. 11 (5th Cir.1974) ("It is not clear whether Smallwood has exchanged his Pearl certificates for [certificates of the new company]. In any event, all Pearl shares have in actuality been converted into [shares in the new company].... Thus the shares of Pearl stock held by Smallwood and other members of his class have been "exchanged,' regardless of the status of the certificates."), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

partner interest" entails. Under the partnership agreement, a "unit" is defined as "a limited partner interest in the Partnership equal to a fraction, the numerator of which is one and the denominator of which is the total number of Units Outstanding...." The term "Partnership Interest" means the interest "of a Partner or Assignee in the Partnership represented by such Partner's or Assignee's ... Units." An "Assignee" in turn is

> a Person to whom one or more Units have been transferred in a manner permitted under this Agreement, who has delivered a properly completed and executed Transfer Application and Eligibility Certification to the Partnership and who thereby has an economic interest in the Partnership equivalent to that of a Limited Partner but ... otherwise subject to the limitations set forth in this Agreement on the rights of an Assignee who has not become a Substituted Limited Partner.

The plaintiffs asserted via affidavit in the court below that they (i) were the beneficial owners of units of limited partnership interest in PDP and (ii) received the Prospectus/Proxy Statement describing the transaction whereby all PDP unitholders would trade in their units for stock in P & P Petroleum. Although the plaintiffs admit that they did not file applications to become substituted limited partners, they claim that their failure to do so was due to the fact they had already learned of the general partner's denial of consent to their admission. The plaintiffs additionally point to several instances in which they were treated as "assignees," including their receipt of the Prospectus/Proxy Statement. Thus, assuming that they have exchanged their units for stock in P & P Petroleum, the plaintiffs have created a fact issue as to their standing to contest the registration statement under section 11(a).[16] Accordingly, summary judgment on this claim for lack of standing as a "limited partner" was improper.

The defendants all but concede that the transaction was a "sale" and that the plaintiffs were "purchasers" for purposes of the Securities Act by their failure to brief this point on appeal; instead, they argue that the plaintiffs have failed to make a requisite showing of injury or causation. In their view, the fact that the plaintiffs have actually profited by substantial increases in their investment precludes their standing. We cannot pass upon the merit of this position because it involves evidence

---

[16]Because we are not provided with the assignment agreements whereby the plaintiffs acquired their units, we intimate no opinion as to whether the instant plaintiffs come within the terms of the definition of "assignee."

not introduced to, or evaluated by, the district court. *See Conkling v. Turner,* 18 F.3d 1285, 1296 n. 9 (5th Cir.1994) (observing that "[t]his court may affirm a grant of summary judgment on any appropriate ground that was raised to the district court and upon which both parties had the opportunity to introduce evidence" and collecting cases); *cf. Topalian,* 954 F.2d at 1131-32 n. 10 (parties may not advance new theories or raise new issues to secure reversal of summary judgment) (citation omitted).[17]

### 2. Section 12(2): the Prospectus/Proxy Statement

Section 12(2) of the Securities Act, 15 U.S.C. § 77*l* (2), provides generally that any person who mails a prospectus with untrue material statements or material omissions is liable to "the person purchasing such security from him." Again, standing to sue under the private right of action afforded by this section is based upon the requirement that the plaintiff be a "purchaser" of the security at issue. The same definition of "sale" discussed above applies to section 12 claims. *See* 15 U.S.C. § 77b(3); *Blue Chip Stamps,* 421 U.S. at 735-36, 95 S.Ct. at 1925 (observing that sections 11(a) and 12 of the Securities Act "are by their terms expressly limited to purchasers and sellers of securities"). For the same reasons we found that there was an issue of fact as to standing under section 11, we find one with respect to the section 12 allegations.

The defendants' arguments on appeal, however, relate to the plaintiffs' alleged inability to show knowing participation in, and materiality of, the misstatements and omissions described in the amended complaint. *See, e.g., Schlesinger v. Herzog,* 2 F.3d 135, 141 (5th Cir.1993) (stating that an essential element of a claim under section 12(2) is materiality of the purported misrepresentation or omission). Those arguments bear upon whether the plaintiffs have made out a *prima facie* case of section 12(2) liability—*not* whether the plaintiffs have standing to assert the claims. As noted above, the district court held only that the plaintiffs lacked standing to sue under section 12(2) because they were not limited partners. The argument that the plaintiffs have failed to show

---

[17]Even if we could reach the issue, we would be hesitant to conclude that there has been no injury—or merely speculative injury—to the plaintiffs who allege that the defendants improperly allocated shares of P & P Petroleum rightfully belonging to PDP to P & P Ltd. As the plaintiffs point out, the increase in the per unit investment would actually represent an increase in their damages under this theory.

materiality of the purported misrepresentations and omissions in the Prospectus/Proxy Statement was not raised to the district court, and we will not entertain it at this time. *E.g., Conkling,* 18 F.3d at 1296 n. 9 (implying that summary judgment may not be affirmed on an alternative ground that was not litigated in the district court).

### 3. Section 10(b) and Rule 10b-5

The district court's assumption that the plaintiffs' failure to establish standing as "limited partners" with the attendant privilege of bringing suit also permeated its disposition of their Exchange Act claims. As noted above, we disagree with the district court that the plaintiffs had to have standing under Texas law to bring claims under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Standing under these provisions requires that a plaintiff be an actual "purchaser" or "seller" of securities who has been injured by deception or fraud "in connection with" the purchase or sale, the so-called "*Birnbaum* rule." *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461, 464 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); *accord Blue Chip Stamps,* 421 U.S. at 749, 755, 95 S.Ct. at 1931-32, 1934.

The federal courts have created an exception to this rule when a investor's interest in a company is fundamentally altered through a merger, acquisition, or liquidation. *E.g., Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). This doctrine, known as the "forced seller" doctrine, was spawned originally in a securities fraud action based upon a short form merger in which the plaintiff was left with no alternative but to exchange his shares for cash because the corporation in which he had held his investment had been completely subsumed in the merger:

> Due to defendant's act, [the merged-out corporation] has now disappeared and the plaintiff's stock has, in effect, been involuntarily converted into a claim for cash.... [I]t is precisely because [the defendant] gives no choice to [the plaintiff] under the [short form merger statute] and the latter must now exchange his shares for cash that [the plaintiff] can now be deemed a seller.

*Vine,* 374 F.2d at 634-35. Accordingly, the *Vine* court found standing for the shareholder to sue as a "forced seller" under section 10(b) and Rule 10b-5. *Id.* at 635.

The forced seller doctrine was at first quite narrowly interpreted by this court, recognizing the standing of such an investor only when "the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares." *Dudley v. Southeastern Factor and Finance Corp.,* 446 F.2d 303, 307 (5th Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971); *Coffee v. Permian Corp.,* 434 F.2d 383, 386 (5th Cir.1970), *cert. denied,* 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973). However, the concept has evolved—at least in the context of merger and acquisition transactions involving involuntary exchanges of securities[18]—in order to keep in step with the realities of the corporate and securities world, and a subsequent line of cases in this circuit has applied the more flexible "fundamental change in investment" test to coerced exchanges significantly altering the nature of the investment. *See Keys v. Wolfe,* 709 F.2d 413, 417 (5th Cir.1983) (holding that securities plaintiffs could state a claim under section 10(b) and Rule 10b-5 upon allegations that there was "such a significant change in the nature of the investment or in the investment risks as to amount to a new investment"); *Rathborne v. Rathborne,* 683 F.2d 914, 921 (5th Cir.1982) ("[W]here a securities transaction results in a fundamental change in the nature of a shareholder's investment, leaving the

---

[18]We note that the majority of cases in this circuit applying the forced seller rule in its most restrictive sense involve claims of dilution or decrease in the value of a same or similar investment which the plaintiff continues to hold after the complained of transaction, rather than an actual exchange of his investment for a different investment in an unrelated company. *Compare Jeanes v. Henderson,* 703 F.2d 855, 860 (5th Cir.1983) (termination of option rights alleged to dilute plaintiff's holdings held not to be a forced sale where plaintiff maintained "an interest in a going concern"); *Alley v. Miramon,* 614 F.2d 1372, 1380, 1387 (5th Cir.1980) (observing that a pledge of securities did not constitute a "sale," whereas a subsequent liquidation converting those shares into "a claim for cash" would); *Broad v. Rockwell,* 614 F.2d 418, 438-39 (5th Cir.1980) (finding that debenture holders whose conversion rights were eliminated in merger were not "sellers" under section 10(b) and observing that "[a]t all times, the debenture holders possessed a debenture backed by an ongoing promise to pay principal and interest"), *different results reached on reh'g,* 642 F.2d 929 (1981); and *Sargent v. Genesco, Inc.,* 492 F.2d 750 (5th Cir.1974) (refinancing plan, which included issuance of new shares in exchange for plaintiffs' debentures in same company and was contended to dilute their holdings, held not to constitute a "sale" of securities); *with Dudley v. Southeastern Factor and Finance Corp.,* 446 F.2d 303, 307 (5th Cir.) (Where investor's corporation had been substantially liquidated and ceased to function, the investment was effectively commuted to a right to payment of money and defrauded investor had status as a forced seller.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971); *Coffee v. Permian Corp.,* 434 F.2d 383, 386 (5th Cir.1970) (finding fact issue as to standing as a forced seller as a result of an allegedly fraudulent liquidation), *cert. denied,* 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973).

plaintiff with shares that represent a participation in a wholly new and different enterprise, the plaintiff may be considered to be a purchaser or seller."); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 591 (5th Cir.1974) (deciding that investor whose shares in one company were converted into shares in another under a merger agreement effectively "sold" his shares in the former and "purchased" shares in the latter for purposes of Rule 10b-5)[19]; *see also Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir.1977) (applying the rule that, for an exchange of securities to constitute a forced sale, "there must be such significant change in the nature of the investment or the investment risks as to amount to a new investment"), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403, and *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978); VIII LOSS & SELIGMAN, SECURITIES REGULATION at 3710 (observing that the doctrine has been "limited" to situations "where the plaintiff is forced to surrender a security for cash *or for a fundamentally different security* " (emphasis added)); *cf. SEC v. National Sec., Inc.,* 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969) (merger in which shareholders were forced to exchange stock in a new and different corporation was covered within the parameters of section 10(b)).[20] Instead of analyzing whether the transaction left the plaintiff with essentially a mere claim to cash, these cases focus on the "economic reality of the transaction" and evaluate the magnitude of the change in the nature of the investment and accompanying risks. *Rathborne,* 683 F.2d at 920.

Thus far, *Blue Chip Stamps* is virtually our only direction from the Supreme Court as to the

---

[19]Interestingly, the plaintiff in *Smallwood* complained of two different transactions—the first involving the involuntary exchange of his shares in a merger, which the court held to constitute a sale, and the second "transaction" whereby he maintained his shares in the new company based upon alleged deception. The court analyzed only the second "maintenance" claim under the forced seller doctrine and held that it was not sufficient to confer independent standing under the securities fraud provision of the Exchange Act. *Smallwood v. Pearl Brewing Co.,* 489 F.2d 597, 591, 594-95 (5th Cir.1974).

[20]In that case, the Supreme Court refused to opine as to whether private plaintiffs could assert that a merger exchange constituted a "purchase" or "sale" for section 10(b) purposes. *SEC v. National Sec., Inc.,* 393 U.S. 453, 467 n. 9, 89 S.Ct. 564, 572 n. 9, 21 L.Ed.2d 668 (1969). However, the case is instructive in that it holds, albeit in a regulatory context, that "[t]he broad anti-fraud purposes of the statute and the rule would clearly be furthered by their application to this type of situation." *Id.* at 467, 89 S.Ct. at 572. Moreover, this court has recognized that the Court's distinction between the regulatory context and a private right of action "has not proved potent." *Smallwood,* 489 F.2d at 590 & n. 10 (citations omitted).

reach of standing to pursue an implied private right of action under section 10(b). As noted above, in *Blue Chip Stamps,* the Court limited standing to sue under section 10(b) to actual purchasers and sellers. The context of that case is highly relevant to the result. The plaintiffs there were offerees of a registered stock offering made pursuant to an antitrust consent decree who claimed that they decided not to purchase the stock due to the "overly pessimistic appraisal" of Blue Chip Stamps' status and future progress which was contained in the prospectus. 421 U.S. at 726-27, 95 S.Ct. at 1921. The Court observed that on two different occasions Congress had failed to adopt changes to section 10(b) proposed by the SEC which would have broadened the scope of the statute to cover offerees and evaluated the benefits of the *Birnbaum* rule with respect to issues of proof, concluding that:

> [W]hat may be called considerations of policy ... [t]aken together with the precedential support for the *Birnbaum* rule over a period of more than 20 years, and the consistency of that rule with what we can glean from the intent of Congress, they lead us to conclude that it is a sound rule and should be followed.

*Id.* at 749, 95 S.Ct. at 1932. The Court did not, however, give any indication as to the continuing viability or scope of the "forced seller" doctrine.[21] Thus, we look to its reasoning for enlightenment. One of the primary bases for the decision was the fact that other provisions of the securities laws, including sections 11(a) and 12 of the Securities Act, were similarly confined to actual purchasers and sellers:

> It would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action.

421 U.S. at 736, 95 S.Ct. at 1925-26. That danger, as discussed above, is not present in the case presented because we have held that the plaintiffs have standing to sue under those liability provisions of the Securities Act. Moreover, the Court in *Blue Chip Stamps* observed that "[t]hree principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule": (i) potential purchasers, like the plaintiffs in *Blue Chip Stamps,* who allege that they decided *not* to purchase shares in a corporation "due to an unduly gloomy representation" or omission; (ii) actual shareholders who

---

[21]This court has acknowledged the continuing vitality of the "forced seller" doctrine after the *Blue Chip Stamps* decision. *See Alley v. Miramon,* 614 F.2d 1372 (5th Cir.1980).

decide not to sell; and (iii) "shareholders, creditors, and perhaps others ... who suffer[ ] loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities...." *Id.* at 737-38, 95 S.Ct. at 1926. Interestingly, the Court did not include those standing in the shoes of the plaintiffs at bar among its categories of putative plaintiffs who are frustrated by the *Birnbaum* rule. Finally, we note that perceived problems of proof involved when no actual sale takes place—e.g., a lack of documentation as to when and at what price a security was "purchased" or "sold"—were integral to the Court's analysis. *Id.* at 734, 742-43, 746, 747, 95 S.Ct. at 1925, 1928-29, 1930, 1931 ("The virtue of the *Birnbaum* rule, simply stated, ... is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates."). The evidentiary problems associated with the more speculative claims described above are simply not present in the case presented where the exchange of the PDP units for P & P Petroleum stock is well-documented. *Cf. Alley v. Miramon,* 614 F.2d at 1387 ("Proof of a corporate liquidation which may give rise to standing under the forced seller rule is based on objectively demonstrable facts."). Thus, we do not believe that the teachings of *Blue Chip Stamps* would preclude standing as section 10(b) "forced sellers" to investors of merged companies who can show a substantial change in the nature of their investments. *E.g., Rathborne,* 683 F.2d at 921; *Abrahamson,* 568 F.2d at 868.

The *Rathborne* rule is consistent with the majority of federal courts and commentators. *E.g., Securities Investor Protection Corp. v. Vigman,* 803 F.2d 1513, 1518 (9th Cir.1986); *Swanson v. American Consumer Indus., Inc.,* 415 F.2d 1326, 1330-33 (7th Cir.1969) (recognizing that "the fraudulent substitution of shareholder status in one company for the same status in another may constitute a cognizable legal injury in and of itself"); *FDIC v. Kerr,* 637 F.Supp. 828, 836 (W.D.N.C.1986) (finding standing where the fundamental nature of a plaintiff's investment has been changed without an actual sale through circumstances beyond his control); *see also* 3C HAROLD BLOOMENTHAL, SECURITIES AND FEDERAL CORPORATE LAW § 11.13, 11-53, 11-54 (1994) ("[I]t appears quite apparent that in a merger, the shareholders in the corporation being acquired are purchasers or sellers ... [and that] shareholders in the corporation which does not survive can satisfy

the *Birnbaum* test...."). Professor Loss notes that, today, standing under the forced seller doctrine

> has been expanded to a variety of transactions other than short form mergers where a defendant's fraud results in a fundamental change in the nature of the plaintiff's investment without the plaintiff's consent. ***For example the doctrine has been applied to a limited partner who had no choice but to accept stock in a corporation in exchange for a partnership interest in a transaction that was conditioned only on approval by the general partner.***

VIII LOSS & SELIGMAN, SECURITIES REGULATION at 3707 (emphasis added) (citing, *inter alia, Mayer v. Oil Field Sys. Corp.,* 721 F.2d 59, 65-66 (2d Cir.1983)). In *Mayer,* an owner of limited partnership interests in partnerships owning oil and gas properties was forced to exchange her interests for common stock in a new corporation pursuant to an exchange agreement between the general partners and the corporation. 721 F.2d at 61. She alleged that the transaction was implemented by a misleading prospectus and registration statement. *Id.* at 62. The Second Circuit found that Mayer had standing to assert section 10(b) and Rule 10b-5 claims because her investment had fundamentally changed. *Id.* at 65. The *Mayer* court carefully distinguished the holdings in *Birnbaum* and *Blue Chip Stamps* on the basis that the plaintiffs in both of those cases "ended up after the alleged fraud exactly where they had begun." *Id.*[22] We find these authorities to be well-reasoned and follow their lead in concluding that a securities exchange, such as in the case at bar, may constitute a forced sale for purposes of section 10(b) and Rule 10b-5 if the plaintiff can demonstrate "a fundamental change in the nature of the investment."

For the reasons discussed above, we conclude that the "fundamental change in the nature of the investment" rule should apply to the allegations set forth in the amended complaint.[23]

---

[22]The defendants' grounds for distinguishing *Mayer* are not compelling. As noted above, we do not find the plaintiffs' lack of status as limited partners to be applicable to their standing to assert federal securities claims. Further, as noted below, we find that the amended complaint does contain specific allegations of fraud and/or deception. Finally, the defendants are mistaken in claiming that Mayer did not maintain an interest in a going concern. In *Mayer,* it was the liquidated partnerships who were left without value; there is no indication that the new corporation was depleted of assets or that it did not continue to exist. *See Mayer v. Oil Field Sys. Corp.,* 721 F.2d 59, 65 (2d Cir.1983).

[23]Although we are mindful of the Supreme Court's caution that "the same words may take on a different coloration in different sections of the securities laws," *SEC v. National Sec., Inc.,* 393 U.S. 453, 466, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969), we are also persuaded by the fact that the transaction clearly constituted a "sale" for purposes of the Securities Act, as discussed above in sections II.B.1 & II.B.2.

We thus turn to the facts before us. There is no question but that the plaintiffs' allegations describe a complete alteration of their limited partnership investment. At the beginning of the day, they owned units in a financially solvent limited partnership, but, after the roll-up transaction was consummated, they owned stock in a corporation made up of at least six other entities, including Damson, whose financial predicament was described at some length in the Prospectus/Proxy Statement. Accordingly, we hold that the plaintiffs have created a fact issue as to their standing to assert claims under section 10(b) and Rule 10b-5.

As a final attempt to block the plaintiffs' standing, the defendants assert once again that they have failed to show any injury as a result of the transaction. Once again, we decline to address this argument, which was not presented in the defendant's papers to the court below.

### 4. Section 14(a): the Prospectus/Proxy Statement

The plaintiffs' remaining cause o f action is based upon alleged misleading statements and misrepresentations in the Prospectus/Proxy Statement used to solicit approval for the roll-up transaction. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), prohibits the solicitation of proxies by virtue of misleading proxy statements. We view section 14(a) as protecting only interest-holders with voting rights. *See, e.g., Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1106-08, 111 S.Ct. 2749, 2765-67, 115 L.Ed.2d 929 (1991) (holding that shareholders whose votes are not required by law or corporate by-law to authorize a corporate action for which proxies are solicited are not entitled to bring an action under 14(a) where they cannot show a causal nexus between the proxy statement and injuries); *United Paperworkers Int'l Union v. International Paper Co.,* 985 F.2d 1190, 1198 (2d Cir.1993) (noting that the SEC promulgated Rule 14a-9 "with the goal of preserving for all shareholders *who are entitled to vote,* not just for those who sponsor proposals, the right to make decisions based on information that is not false or misleading" (emphasis added)). Indeed in *J.I. Case Co. v. Borak,* the Supreme Court observed that the stated congressional purpose of section 14(a) was to " "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which ... [had] frustrated the free exercise of the voting rights of stockholders.' " 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964) (quoting

H.R.Rep. No. 1383, 73d Cong., 2d Sess., 14 (1934)).[24] Although section 14(a) does not necessarily require that the plaintiff have actually voted in reliance upon the challenged Prospectus/Proxy Statement—*e.g., Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384-85, 90 S.Ct. 616, 621-22, 24 L.Ed.2d 593 (1970); *Keyser v. Commonwealth Nat'l Fin. Corp.,* 121 F.R.D. 642, 648 n. 15 (M.D.Pa.1988); *Hershfang v. Knotter,* 562 F.Supp. 393, 397-98 (E.D.Va.1983), *aff'd,* 725 F.2d 675 (4th Cir.1984)—we believe that it goes too far to allow persons not even entitled to vote to assert a claim under that provision. As noted in one of the cases cited by the plaintiffs, the rationale for permitting a stockholder to assert a cause of action under section 14(a) regardless of whether he actually relied upon the misleading statement is to protect the voting process as a whole from misinformation; it is simply a recognition that the stockholder is bound by the collective action of his other stockholders who may have been misled by the statement. *Dowling v. Narragansett Capital Corp.,* 735 F.Supp. 1105, 1120 (D.R.I.1990); *see also Dann v. Studebaker-Packard Corp.,* 288 F.2d 201, 209 (6th Cir.1961) (observing that "the right sought to be protected by federal law is the right to full and fair disclosure in corporate elections" and holding that the non-voting plaintiff stockholders had standing under section 14(a) because "they could suffer equally damaging injury to their corporate interests merely because other [voting] shareholders were deceived ...").

None of the cases cited by the plaintiffs supports a holding that a person not even eligible to vote has standing to maintain an action under section 14(a). Indeed, the plaintiffs in those cases were universally shareholders with voting rights. The authority that comes closest to sustaining their position is *Palumbo v. Deposit Bank,* 758 F.2d 113 (3d Cir.1985); however, that case is distinguishable. In *Palumbo* a disgruntled director, who was also the largest shareholder of the banking corporation, was ousted from his position as director via an allegedly misleading proxy statement. *Id.* at 114. Although the decision includes language to the effect that "[s]tanding depends upon injury," and discusses Palumbo's injury in terms of his capacity as a director, *see id.* at 116, Palumbo's status as a shareholder with voting privileges cannot be overlooked. We cannot believe

---

[24]*See also* S.Rep. No. 792, 73d Cong., 2d Sess., 12 (1934) ("Too often proxies are solicited without explanation to the stockholder of the real nature of the questions *for which authority to cast his vote is sought* (emphasis added).").

that the Supreme Court, in finding a private right of action under section 14(a), *see Borak,* 377 U.S. at 431, 84 S.Ct. at 1559, intended to open Pandora's box by extending that right to any person potentially injured by a proxy statement; otherwise, standing could be justified for disappointed potential merger partners, disgruntled employees, etc. Accordingly, we are unwilling to expand standing under section 14(a) of the Exchange Act to interest-holders who are not qualified to vote.

Finding that voting rights are critical to standing under section 14(a), we look to the relevant documents to determine whether the plaintiffs had such rights and conclude that it is clear that they were not entitled to vote on the proposal embodied in the Prospectus/Proxy Statement. The document itself specifically recites that "[o]nly limited partners of PDP at the close of business on December 26, 1990, as shown on PDP's records, will be entitled to vote, or to grant proxies to vote, at the meeting of the limited partners of PDP." The references throughout reflect that the voting provisions of the Prospectus/Proxy Statement were addressed exclusively to PDP's limited partners. The partnership agreement confirms that:

> Only those Record Holders of Units who are Limited Partners on the Record Date set pursuant to Section 15.7[25] shall be entitled to notice of and to vote at a meeting of Limited Partners.... ***With respect to Units that are held by persons who have not been admitted as Limited Partners, the General Partner will be deemed to be the Limited Partner with respect to such Units and will vote such Units in the same percentages as the other Units have been voted with respect to a particular matter*** (emphasis added).

The fact that the plaintiffs may have received proxy materials does not override the unequivocal provisions of the partnership agreement and Prospectus/Proxy Statement.[26]

5. Substantive claims under the Federal securities laws

Having found that the plaintiffs have the requisite standing to assert claims under sections

---

[25]The December 18, 1990, letter from Lon Kile, a PDP vice-president, to various entities involved in the proxy solicitation set December 26, 1990, as the "record date" for determining which unitholders were entitled to vote. Contrary to the plaintiffs' argument, the letter's reference to "unitholders" is entirely consistent with the above-quoted provision of the partnership agreement permitting only those "unitholders" who are limited partners of record to vote.

[26]The plaintiffs also claim that the "defendants' counsel admitted that proxy vote authorizations received from all PDP Unitholders were to be voted at the special meeting to be held on February 19, 1991." However, the citation to the record is to an affidavit of *the plaintiffs'* counsel as to his understanding of the arrangement. What the plaintiffs' counsel may have been told is inadmissible hearsay and, in any event, does not evidence an "admission" that the votes of non-"limited partner" unitholders were tabulated in the meeting.

11(a) and 12(2) of the Securities Act, section 10(b) of the Exchange Act, and Rule 10b-5, we turn to the defendants' general assertion that the plaintiffs have failed to plead cognizable federal securities claims. According to the defendants, the plaintiffs allege at most mismanagement, including waste, breach of fiduciary duty, and conversion—none of which is sufficient to invoke the federal securities laws. *E.g., Rodman v. Grant Found.,* 608 F.2d 64, 72-73 (2d Cir.1979). While we agree with the defendants that a federal securities action should not lie for state law causes of action, we disagree with their premise that the plaintiffs' allegations are limited to mismanagement. Rather, as discussed above in section I-C, the plaintiffs make several precise attacks upon misstatements and omissions contained in the Prospectus/Proxy Statement which was also filed with the SEC as part of P & P Petroleum's stock registration. This case therefore falls within the bounds of the Supreme Court's decision in *Santa Fe Indus., Inc. v. Green,* holding that, although mismanagement or breach of fiduciary duty generally would not violate the federal securities laws, an action for securities fraud was appropriate for those cases "in which the breaches of fiduciary duty held violative of Rule 10b-5 included some element of deception." 430 U.S. 462, 474-76 & n. 15, 97 S.Ct. 1292, 1301-02, n. 15, 51 L.Ed.2d 480 (1977). After viewing the amended complaint with an eye favorable to the plaintiffs, as we must, we cannot conclude that the plaintiffs will be unable to prove any set of facts which would entitle them to relief. *E.g., Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Keys v. Wolfe,* 709 F.2d at 417. Nor have the defendants directed us to summary judgment evidence which would show an absence of any factual issue on this point; rather, on appeal, the defendants argue only that the plaintiffs have "failed to *plead* their claims sufficiently to cause this Court to probe the substantive federal securities laws" (emphasis added). Accordingly, this contention is not grounds for alternatively affirming summary judgment on those claims for which we have found standing.

### III. Conclusion

For the foregoing reasons, we REVERSE the district court's summary adjudication of the plaintiffs' causes of action under (i) sections 11 and 12 of the Securities Act and (ii) section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and REMAND for further

consideration of those claims in accordance with this opinion. We AFFIRM the remainder of the district court's judgment. Costs are to be borne by the defendants-appellees.